**CITY OF STEUBENVILLE, Appellant,**

v.

**VILLAGE OF WINTERSVILLE, Appellee.**

[Cite as *Steubenville v. Wintersville,* 168 Ohio App.3d 430, 2006-Ohio-4381.]

Court of Appeals of Ohio,
Seventh District, Jefferson County.

No. 05 JE 33.

Decided Aug. 17, 2006.

S. Gary Repella, Steubenville Law Director; Pietragallo, Bosick & Gordon and Robert J. D'Anniballe Jr., for appellant.

Baumgartner & O'Toole and Dennis M. O'Toole, for appellee.

---

WAITE, Judge.

{¶ 1} Appellant, the city of Steubenville, filed this appeal of a decision of the Jefferson County Court of Common Pleas regarding a $600,000 debt that appellee, the village of Wintersville, owed to Steubenville in a contract dispute. Steubenville supplies water to Wintersville, and the dispute arose over provisions of the water contract involving rate increases and payments for capital improvements. The trial court determined that the contract obligated Wintersville to pay $600,000 toward a capital-improvement project but that it had already paid $437,784 of that obligation through water-rate increases imposed by Steubenville. Steubenville argues on appeal that it is owed the full $600,000 and that no part of the water rate increases should have been credited toward the capital-improvement obligation. Based on the clear and unambiguous provisions in the contract, the trial court should have decided in favor of Steubenville for the full $600,000. The judgment of the trial court is hereby modified to reflect this full award to Steubenville.

{¶ 2} The parties entered into a water-supply contract on December 1, 1997. Steubenville supplies bulk water to Wintersville, which in turn sells this water to its own customers. The contract set Wintersville's water rate at two dollars per 1,000 gallons of water. The contract then stated, "[W]hen the City [of Steubenville] raises customer rates within the City, such rate adjustments shall be proportioned to the amount of adjustment received by the City's customers. The base of adjustment shall be the rate of adjustment applied to the City customers plus twenty percent (20%)." There are no other limitations on when, where, why, or how Steubenville might raise Wintersville's water rates.

{¶ 3} The contract then states that Wintersville "agrees to participate in City capital improvement projects" and that "[t]he Village agrees to pay the City six (6%) percent of the actual costs incurred by the City for said project(s) provided the cost exceeds One Hundred Fifty Thousand Dollars ($150,000.00)." The contract capped Wintersville's participation in the capital-improvement projects at $600,000.

{¶ 4} On November 7, 2000, Steubenville passed a local ordinance raising water rates to city customers over a six-year period beginning in January 2001. Wintersville, in turn, raised the water rates of its customers beginning in January 2001. Wintersville also collected an additional $12,500 per month, or $150,000

annually, for four years and set aside this $600,000 in a special fund for its capital-improvement obligation to Steubenville. Those funds were over and above the rate increases Wintersville passed on to its customers due to its bulk-rate increase from Steubenville.

{¶ 5} Steubenville made a request for payment of the capital-improvement obligation in early 2004. Wintersville refused to pay this amount to Steubenville. Wintersville claimed that it had already paid its capital-improvement obligation when it paid the rate increases Steubenville instituted in 2001. Wintersville claimed that Steubenville used rate increases as the means to collect the capital-improvement charge.

{¶ 6} Steubenville filed a complaint on April 6, 2004, in order to collect the full $600,000 capital-improvement charge set forth in the contract.

{¶ 7} The trial court found that Steubenville had expended $10,415,706 in actual capital improvement costs during the contract period. Pursuant to contract, Wintersville owed six percent of this amount as its participation in the capital-improvement program, up to a maximum commitment of $600,000. As the trial court correctly found, Wintersville owed the maximum amount of $600,000 as its capital-improvement charge. The trial court also found, however, that Steubenville "unilaterally" implemented higher water rates on November 7, 2000, and that those higher rates were designed to gain additional revenue for capital improvements to Steubenville's water system. The court held that these rate increases were a violation of the contract. The court found that the additional amount attributable to the rate hikes totaled $437,784 and deducted this amount from the $600,000 that Wintersville owed for capital improvements. This timely appeal followed.

{¶ 8} Steubenville presents two related assignments of error on appeal:

{¶ 9} "The trial court erred in ruling that Steubenville was in violation of the contract between the parties when Steubenville raised water rates in November of 2000."

{¶ 10} "The trial court erred in ruling that the $437,784.00, which represents the amount of rate increases over $2.00 per thousand gallons Wintersville already paid to Steubenville for 2001, 2002, 2003 and 2004, be credited toward the capital improvement obligation of $600,000.00."

{¶ 11} The issues involved in this appeal are fundamentally issues of law involving the interpretation of a contract, which is reviewed de novo on appeal. *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949. "Contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Skivolocki v. E. Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374, paragraph one of

the syllabus. "[W]here the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 246, 7 O.O.3d 403, 374 N.E.2d 146.

{¶ 12} Steubenville argues on appeal that the rate increase provision of the contract is independent of the provision requiring Wintersville to pay up to $600,000 for capital improvements. Steubenville contends that there is nothing in the contract that allowed Wintersville to offset the capital-improvement charge if Steubenville raised its underlying water rates. Steubenville asserts that Wintersville was aware of its obligation to pay up to $600,000 for capital improvements, that Wintersville raised its rates to its own customers in an amount sufficient not only to pay for the actual rate increase but to generate an additional $600,000, and that it collected the money over four years and placed it in a separate account. Steubenville notes that Wintersville's own law director conceded that there was no provision in the contract to offset the capital-improvement obligation. Steubenville argues that the trial court ignored the plain language of the contract by deducting $437,784 from Wintersville's capital-improvement obligation when that amount was solely attributable to a separate issue: legitimate and permissible rate hikes. We agree with Steubenville's argument.

{¶ 13} Wintersville's claim that the $600,000 capital-improvement charge is dependent on Steubenville's projected reasons for making rate adjustments adds terms to the contract that simply are not there and amounts to creating an ambiguity where there is none. Neither the rate-hike provision nor the capital-improvement provision have language that makes them dependent on each other. As the contract now stands, Wintersville owes the capital-improvement charge regardless of what has happened or what will happen with respect to water-rate hikes because these are separate and independent issues. Wintersville previously collected capital-improvement funds through a separate charge to its own customers. Wintersville knew it owed the money, collected the money, and did not pay the money. This is the entirety of the controversy in a nutshell.

{¶ 14} The dissent cites our recent case of *Steubenville v. Jefferson Cty.*, 7th Dist. No. 05 JE 23, 2005-Ohio-6596, 2005 WL 3370602, in order to support the trial court judgment, but this case is wholly inapplicable. While it is true that the recent case also dealt with payment of monies for capital improvements to Steubenville's water system, the terms of the contract between Steubenville and Jefferson County were completely different from those between Steubenville and Wintersville. The Jefferson County contract was entered into in 1981 as a flat-rate contract and allowed modifications to the water rate based only on demonstrable need. The Jefferson County contract specifically stated that rate modifi-

cations could not be used for the purpose of increased capitalization. Id. at ¶ 3. There are no such terms in Wintersville's contract, and we cannot read those terms into the contract simply because they existed in a different water contract between Steubenville and another customer.

{¶ 15} The trial court correctly concluded that Steubenville had the burden of proof to demonstrate breach of contract and monetary damages. Steubenville established its case-in-chief by relying on the terms of the contract and by providing evidence that it had expended over $10,000,000 in applicable capital improvements during the contract period. These facts, along with the fact that Wintersville did not directly pay the capital-improvement charge, are not in question. Once these facts were established, the burden then shifted to Wintersville to establish any defenses. Wintersville's primary defense was that it had already paid the capital improvement charge indirectly through rate hikes and that it did not owe an additional charge. Quite simply, the terms of this contract allow Steubenville to increase its bulk rate to Wintersville any time it increases the rate to its Steubenville customers for any reason. Regardless of any rate increase, Wintersville is obligated to pay a share of capital improvements. Given the clear terms of the contract, then, Wintersville cannot use this defense. With no other viable defenses, Wintersville is liable to pay the $600,000 capital-improvement charge.

{¶ 16} The trial court (and the dissent) appear to conclude that the provision charging Wintersville up to $600,000 for capital improvements would be meaningless if Steubenville were also permitted to collect further capital-improvement fees through rate increases. This is incorrect for at least two reasons. First, the capital-improvement charge assures that Steubenville receives a definite dollar amount for capital improvements, rather than relying solely on the variable income from water usage to pay for such improvements. Ultimately, Steubenville was entitled to collect $600,000 from Wintersville even if Wintersville failed to use any water.

{¶ 17} Second, directly charging Wintersville a certain amount for capital improvements allowed Wintersville to control how it would collect that money, rather than leaving the method of collection completely in the hands of Steubenville to raise or adjust the water rates of all of its customers as the only means to collect capital-improvement funds. Wintersville could collect the $600,000 over one year, or five years, or ten years, whereas Steubenville might want to recoup its capital expenditures over a different time period. Furthermore, there is absolutely no language in the contract that says that capital improvements can be paid for only by across-the-board water-rate increases that are equal for all customers. While Wintersville might think this is the most fair way to recoup

capital-improvement costs, it is simply not the way the parties bargained for capital improvements to be paid for when they entered into this contract.

{¶ 18} Further, the trial court's interpretation of the contract, as well as the dissent's, seems to turn the language of the contract on its head, creating the opposite result of what is set forth in the contract. This point can best be illustrated by comparing the dissent's interpretation to some other types of contracts. For purposes of illustration, we will assume that the parties entered into a five-year newspaper advertising contract. This contract contains a provision that all ads will be billed at $10 per column inch, and the customer is also required to pay one percent of the cost of a new printing press, up to a maximum of $100. Under the theory proposed by the dissent, after the customer pays for ten column inches, he or she can then demand free ad space for the duration of the contract, because any further income from the print ads would undoubtedly be used to help pay for the new printing press. Likewise, in a lawn care contract by which a gardener is paid $25 each week to mow the lawn and also requires the customer to contribute a maximum of $10 to the purchase of a new lawnmower, can the customer require the gardener to keep mowing the lawn for free after the first week? Under the dissent's theory, that would be the logical conclusion, because any additional fees paid by the customer would also be helping to pay for the lawn mower.

{¶ 19} In both of these cases, the provision for the customer to contribute an extra amount for capital improvements is being interpreted to actually lower (or even eliminate) the costs to the customer, rather than interpreted for its clearly intended purpose, which is to help the seller generate additional funds for capital improvements. In the instant case, it is apparent that the capital-improvement clause of the contract has a specific purpose, which is to allow Steubenville to directly charge Wintersville up to $600,000 for capital improvements, unrelated to the rates charged for actual usage of water.

{¶ 20} The trial judge found that Steubenville had breached the parties' contract by raising water rates in retaliation for Wintersville's refusal to renegotiate the contract after it became clear that more capital improvements would be needed. We disagree that Steubenville's increase constituted a breach of contract, because the contract allowed Steubenville to raise its water rates and did not require that Steubenville justify or provide any reasons for any increase. It is Steubenville's water system and Steubenville controls the rates under the terms of the contract. There are no restrictions in the contract limiting the ability of Steubenville to raise water rates, other than the single provision that Wintersville's rate hikes will be tied to the rate hikes imposed on Steubenville customers, plus 20 percent extra.

{¶ 21} We are persuaded by Steubenville's assignments of error, and therefore, we hereby modify the judgment of the trial court. We hold that Steubenville did not breach the contract by raising its water rates after November 7, 2000, and we eliminate the offset of $437,784 that the trial court granted to Wintersville. Judgment is granted in favor of Steubenville in the amount of $600,000, to bear interest at the legal rate from April 6, 2004, as ordered by the trial court.

Judgment reversed.

VUKOVICH, J., concurs.

DEGENARO, J., dissents.

DEGENARO, Judge, dissenting.

{¶ 22} Wintersville's obligation to pay water-rate increases is separate and distinct from its capital-improvement obligation when its contract with Steubenville is read in the abstract. However, we are not asked to interpret this contract in a vacuum; we must apply it to the specific facts of this case. Those facts show that Steubenville merged these two obligations when it designed its rate increases to specifically pay for capital improvements because the contract limited Wintersville's obligation to participate in those capital improvements. Any other conclusion either ignores the trial court's factual findings or renders the cap on Wintersville's capital improvement obligation meaningless. For these reasons, I respectfully dissent and would affirm the trial court's decision.

{¶ 23} The contract between Wintersville and Steubenville allows Steubenville to raise water rates and places no explicit limitation on its ability to do so. The contract also requires that Wintersville participate in certain capital improvements once the costs of those improvements exceed a minimum threshold, but caps Wintersville's obligation to participate in those capital improvements.

{¶ 24} During the bench trial, Wintersville showed that Steubenville was advised that it could pay for the capital improvements by increasing water rates by just over $.50 per year for six years. After Wintersville rejected a proposal to renegotiate the water-supply contract, Steubenville raised Wintersville's water rates by just over $.50 per year for the four years prior to trial. Based on these facts, the trial court found that Steubenville raised the water rates it charged Wintersville and that those rate increases were specifically designed to pay for the capital improvements discussed in the contract. Steubenville has not challenged this factual finding on appeal.

{¶ 25} The trial court's subsequent conclusion is merely a matter of logic: If the water rate increases were specifically designed to pay for capital improvements and there is a maximum amount that Wintersville must pay toward capital improvements, then the money Wintersville paid in the form of rate increases

specifically implemented to fund capital improvements should count toward satisfying its capital-improvement obligation.

{¶ 26} It cannot be stressed enough, however, that the only way to reach this conclusion is because of the trial court's finding that the rate increases were specifically designed to pay for the capital improvements discussed in the contract. If the trial court had not found this fact, then the rate increases would not have satisfied Wintersville's capital-improvement obligation.

{¶ 27} Given the trial court's factual findings, the opposite conclusion would render the cap essentially meaningless. Steubenville could simply pass along the cost of the capital improvement to Wintersville in the form of raised water rates. Wintersville's "maximum participation in capital improvements" would not be the $600,000 limit agreed to in the contract; it would be an unlimited amount that Steubenville would choose to charge. The parties' agreement to limit Wintersville's exposure to the costs of the planned capital improvements would be ignored.

{¶ 28} In its opinion, the majority does not recognize that the trial court has made this factual finding, preferring to interpret and apply the contract in the abstract. However, "the law does not operate in a total vacuum." *Woelfling v. Great–West Life Assur. Co.* (1972), 30 Ohio App.2d 211, 224, 59 O.O.2d 351, 285 N.E.2d 61. We must apply the plain language of a contract to the facts found by the trial court if there is "some competent, credible evidence exists to support the findings of fact and conclusions of law rendered by the trial court." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

{¶ 29} In this case, there is competent, credible evidence supporting the trial court's factual conclusion that Steubenville specifically raised water rates to pay for the capital improvements, which Steubenville does not dispute on appeal. The contract caps Wintersville's participation in those capital improvements. Accordingly, any amount Wintersville pays in the form of rate increases should count toward its capital-improvement obligation. The judgment of the trial court should be affirmed.