[Cite as *E. Liverpool v. Buckeye Water Dist.*, 2010-Ohio-3170.]
STATE OF OHIO, COLUMBIANA COUNTY
IN THE COURT OF APPEALS
SEVENTH DISTRICT

| | | |
|---|---|---|
| THE CITY OF EAST LIVERPOOL | ) | CASE NO. 08 CO 19 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| BUCKEYE WATER DISTRICT, et al. | ) | |
| | ) | |
| DEFENDANTS-APPELLANTS | ) | |

CHARACTER OF PROCEEDINGS: Civil Appeal from the Court of Common
Pleas of Columbiana County, Ohio
Case No. 05-CV-502

JUDGMENT: Affirmed in part. Modified.

APPEARANCES:
For Plaintiff-Appellee: Atty. Charles L. Payne
Law Director – City of East Liverpool
617 S. Clair Avenue
East Liverpool, Ohio 43920

Atty. Thomas W. Connors
Atty. James M. Wherley, Jr.
Black, McCuskey, Souers & Arbaugh
220 Market Street, Suite 1000
Canton, Ohio 44702

For Defendants-Appellants: Atty. Dennis M. O'Toole
Stumphauzer, O'Toole, McLaughlin
McGlamery & Loughman Co., LPA
5455 Detroit Road
Sheffield Village, Ohio 44054

Atty. Frederick C. Emmerling
114 W. Sixth Street
P.O. Box 25
East Liverpool, Ohio 43920

JUDGES:
Hon. Cheryl L. Waite

Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated: June 21, 2010

WAITE, J.

**{¶1}** Appellants Buckeye Water District ("BWD") and the Board of Commissioners of Columbiana County ("Commissioners") have filed an appeal of a $9.7 million judgment against them regarding the breach of a water service agreement (the "Agreement"). The Appellee is the City of East Liverpool ("East Liverpool"). Commissioners entered into the 30-year Agreement in 1995, agreeing to purchase a minimum of 235,000 gallons of water per day from East Liverpool. The Agreement was later assigned to BWD. Appellants failed to pay the amount required under the Agreement starting in 2004, and eventually notified East Liverpool that they were repudiating the Agreement due to various alleged breaches of the Agreement by East Liverpool. East Liverpool filed a breach of contract complaint in 2005. The case was heard at a bench trial ending in September, 2007, in the Columbiana County Court of Common Pleas. Two of the main issues at trial were whether Appellants were justified in repudiating the contract because: (1) East Liverpool did not provide the proper quantity and pressure of water called for in the contract; and (2) East Liverpool failed to provide safe potable drinking water, particularly water that was free from trihalomethanes ("THMs"). THMs are a byproduct of the chlorination process, and the Ohio Environmental Protection Agency ("OEPA") limits the amount of THMs that may occur in drinking water. Appellants claimed that their water was contaminated with THMs.

**{¶2}** After trial concluded on September 6, 2007, the trial court required the parties to prepare post-trial memoranda. Appellants filed proposed findings of fact and conclusions of law. BWD asserted that East Liverpool had been cited 13 times by the OEPA, and that these citations constituted a breach of the contract. East Liverpool subsequently filed its own findings of fact and conclusions of law.

**{¶3}** In February of 2008, the trial court found in favor of East Liverpool on all issues. The court noted that in Appellants' proposed findings of fact and conclusions of law they had abandoned their prior arguments regarding the level of THMs in the water, and instead focused on various citations that had been issued by the OEPA. The court found that the OEPA citations were for failure to monitor and not for actual contamination of East Liverpool's water supply. The court held that receipt of the citations did not amount to a breach of the Agreement. The court also determined that East Liverpool maintained sufficient volume and pressure over the course of the Agreement. The court awarded $1,480,963.91 in damages for the period from August, 2004, to December of 2007. It also awarded $8,233,082.46 for future damages starting from January of 2008 and continuing for the remaining 18 years of the contract based on the contract price of $5.64 per 1000 gallons, and further based on the minimum contractual amount of 235,000 gallons per day. The total award was $9,714,046.37. The court did not perform any calculation to reduce the future damages award to present value.

**{¶4}** Appellants argue on appeal that the verdict does not comport with the weight of the evidence. Appellants contend that the evidence presented at trial shows that the water pressure was insufficient and that there were elevated levels of

THMs. Appellants assert that both of these facts constitute breaches of the Agreement and should have allowed them to repudiate the Agreement. Appellants' arguments are not persuasive. The record reflects that the water pressure met the contractual requirements and that the water delivered to Appellants was not contaminated.

{¶5} Appellants also argue that political entities such as East Liverpool and BWD cannot sue or be sued for lost profits when a water supply agreement is breached. We have found no legal support for this conclusion.

{¶6} The remainder of Appellants' arguments deal with the court's calculation of damages. Appellants allege that the profit margin East Liverpool was receiving from the contract was excessive, but this is not borne out by the record. Appellants contend that the award for future damages was speculative, even though the damages were calculated by simply taking the current contract price for the water, less costs avoided, and multiplied by the remaining years of the contract. We do find merit, though, in Appellants' final argument regarding the trial court's decision not to reduce future damages to present value. The Ohio Supreme Court has held that future damages must be reduced to present value. *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 425, 644 N.E.2d 298. The record reflects that the trial court considered the discount rate for reducing the future award to present value, but offset this value with presumed inflationary rate hikes that East Liverpool would have been permitted to make over the course of the Agreement had Appellants not breached the Agreement. Although there may be circumstances when an offset for inflation might apply, the facts of this case do not present such circumstances. Given

the extreme length of the water supply contract, the fact that East Liverpool's water rates were already inflated by rate increases instituted after the dispute with Appellants arose, the clear directive by the Ohio Supreme Court, and a number of other factors, we conclude that the trial court should have reduced the future damages award to present value. East Liverpool proposed a discount rate of 5.08% to reduce the award to present value, and this is the rate that should have been applied. The trial court judgment is hereby modified to reflect the application of a 5.08% discount rate. The damages award is reduced to $4,842,752.99 to reflect that future damages have been reduced to present value.

<u>History of the Case</u>

**{¶7}** East Liverpool and the Commissioners entered into a written "Water Service Agreement" on December 15, 1995. The Agreement was for 30 years, terminating on December 31, 2025. The initial purpose of the Agreement was to supply water to customers in Wellsville and Calcutta, Ohio. East Liverpool agreed to provide up to 1,000,000 gallons of water per day to the Commissioners. The first 500,000 gallons per day would be made available immediately, and the remaining amount would be available following water treatment plant modifications or OEPA approval. The Commissioners agreed to pay $3.03 per 1000 gallons for the first 235,000 per day, and $1.70 per 1000 gallons for any additional amounts. The Commissioners agreed to purchase at least 235,000 gallons per day for the duration of the Agreement, and there were no restrictions on how the water could be resold. The Agreement allowed East Liverpool to raise the rate it charged the

Commissioners for water. By May of 2005, this rate had risen to $5.64 per 1000 gallons.

{¶8} The Agreement required East Liverpool to provide water at "the present volume and pressure," and the delivery point was to be measured "at a point 113 feet beyond the valve at the Corporation line on Cartwright Street or other points agreeable to both parties." (12/15/95 Agreement, p. 3, ¶5.) Cartwright Street is a short distance south of the primary water tank used by Appellants to store and redistribute the water it purchased from East Liverpool under the Agreement. The delivery point in the Agreement is prior to the point where the water enters the tank.

{¶9} The Agreement provided that the Commissioners would only be billed for the actual amount of water used by its customers. It also provided that the water that could not be accounted for by the county could not exceed 20% of the usage shown on the master water meters.

{¶10} On April 29, 1996, the Commissioners assigned the performance of the Agreement to BWD. East Liverpool was not involved in this assignment.

{¶11} From 1995 through 2004, BWD expanded its customer base, which led to an increase in the volume of water being drawn from the East Liverpool water system. In 1996, BWD used 235,000 gallons per day. By 2004, this amount increased to 400,000 gallons per day.

{¶12} In 2002, representatives of BWD notified East Liverpool that there was a problem with the pressure of the water. East Liverpool responded that it was continuing to supply the pressure and volume as agreed in 1995. At the same time

BWD began complaining about the water pressure, it was making plans to build its own water treatment plant to supply up to 4 million gallons per day to its customers.

{¶13} On March 21, 2003, BWD served notice that it considered East Liverpool to be in breach of the Agreement for three reasons. The first was alleged inadequate pressure and volume. The second was failure to supply safe potable water, primarily due to the existence of THMs in the water. The third reason for declaring a breach was failure to evenly distribute the water supply.

{¶14} On September 24, 2003, BWD notified East Liverpool that it would have alternate supplies of water available on April 1, 2004. BWD began lowering its consumption of water under the Agreement in 2004. After April 1, 2004, BWD began paying East Liverpool only for the amounts of water it was using, even though the amount was below the minimum amount of 235,000 gallons per day established in the Agreement. BWD eventually stopped using any water from East Liverpool by early 2006.

{¶15} East Liverpool filed a breach of contract complaint in the Columbiana County Court of Common Pleas on May 19, 2005. The defendants were the Commissioners and BWD. The trial of the case took place, on and off, over a period of four months, starting on May 2, 2007, and concluding on September 6, 2007. East Liverpool called the following witnesses: Robert Disch, East Liverpool Utilities Director; Charles Allison, board member of BWD; Ronald Huprich, project engineer for East Liverpool; Steven Polen, BWD Manager; David Stewart, consulting engineer; Alfred DeAngelis, BWD District Manager; Bert Dawson, Columbiana County Engineer; William Butler, former East Liverpool Treasurer; and Timothy Clark, East

Liverpool Water Department Superintendent. Appellants called many of these same witnesses, along with Charles Bibi, trustee of BWD; Roy Dray, former BWD interim director and board member; John Pierko, consultant for BWD; David Frank, civil engineer; and expert witness Beth Darnell, plant manager for the Avon Lake water plant. Hundreds of exhibits were presented during trial. The combined exhibit lists of the parties encompasses 39 pages.

{¶16} The following evidence was established at trial. The parties do not dispute that East Liverpool and the Commissioners entered into a 30-year water service agreement on December 15, 1995. The Agreement is to terminate on December 31, 2025. The agreement was modified slightly in writing on April 9, 1996. The terms of this modification are not part of the dispute between the parties. On April 29, 1996, the Commissioners assigned the performance of the Agreement to BWD. East Liverpool was not part of this assignment, and there does not appear to be any dispute that the Commissioners and BWD are jointly liable for any breach of the Agreement. The initial water rate was $3.03 per 1000 gallons for the first 235,000 gallons used.

{¶17} In January 2002, BWD Director Steven Polen had discussions with East Liverpool regarding levels of THMs in the water. The OEPA had notified the parties in 2000 that THM regulations were going to becoming more strict, and that a new standard of 80 parts per billion would be applied starting in January of 2004. The prior standard was 100 parts per billion. Records introduced at trial indicated that East Liverpool was in compliance with THM requirements prior to January, 2004, and

that after the new regulation took effect, it kept its THM level below 80 parts per billion.

{¶18} On May 16, 2002, BWD approved the building of a new 4 million gallon per day water treatment plant. Charles Allison, a board member of BWD, raised concerns about authorizing the new plant because of the prior obligations under the East Liverpool water Agreement. He informed the board that, although he hoped the East Liverpool Agreement could be broken, there were no guarantees. (Tr., Vol. 1, p. 136.)

{¶19} On July 22, 2002, BWD wrote to East Liverpool complaining that there were problems with the water pressure at the Oakmont tank. East Liverpool's Utility Director, Robert Disch, examined the situation and determined that pressure was being maintained pursuant to the Agreement. He informed BWD that they had the option under the Agreement to build a direct tap-in line to East Liverpool's water treatment plant, and thereby could pump and control their own water supply as needed. This would be at BWD's expense. BWD declined to utilize this option in the Agreement. Various exhibits were introduced at trial establishing that the water pressure both before and after the execution date of the Agreement was being maintained at 46-49 psi.

{¶20} On March 21, 2003, BWD sent a letter to East Liverpool claiming that the city failed to provide a safe water supply by having elevated levels of THMs in the water, and that East Liverpool had breached the Agreement. Subsequently, BWD began reducing the amount of water drawn from East Liverpool, and began paying only for the water they used even if it was less than the minimum usage of 235,000

gallons per day as required by the Agreement. East Liverpool attempted to address BWD's concerns about the quality of the water and the increasing water needs of the district, but when it became clear that BWD intended to stop purchasing any water from East Liverpool, a breach of contract complaint was filed.

{¶21} After trial, the court ordered the parties to file post-trial memoranda. On December 7, 2007, Appellants filed proposed findings of fact and conclusions of law, and filed an amendment on December 11, 2007. East Liverpool filed its own proposed findings of fact and conclusions of law on December 21, 2007. The parties both followed up with reply memoranda. The trial court entered its judgment on February 13, 2008, borrowing liberally from East Liverpool's proposed findings of fact and conclusions of law. The court found that East Liverpool maintained appropriate volume and pressure of water during the course of the Agreement. The court rejected Appellants' contention that East Liverpool was required to maintain pressure of at least 49 psi at the meter leaving the Oakmont tank. The court found no evidence that the water being sold to Appellants was ever contaminated or unsafe, although it acknowledged that there was one incident when the water pressure briefly dropped below 20 psi. The court found that Appellants had dropped their claims regarding THM contamination. The court determined that Appellants were maintaining only their breach of contract claim based on the OEPA citations given to East Liverpool during the term of the Agreement. The court found that these violations were for failure to monitor and were not due to actual unsafe or contaminated conditions, and therefore, that the OEPA citations could not be used as the basis for breach of contract claims. The court also reviewed a number of

complaints regarding lack of communication between East Liverpool and Appellants. The court found that Appellants decided in 2002 to build a new water treatment plant, and based on that decision, did not want to continue paying for water from East Liverpool. The court found that Appellants received approval from OEPA to install an emergency booster pumping station, but failed to inform OEPA that they would be using this station on a regular basis to avoid purchasing water from East Liverpool. The court found that Appellants terminated the Agreement on the same day that the new booster pumping station was scheduled to go online. The court found that the reasons given by Appellants for terminating the Agreement were pretexual, and determined that many of Appellants' witnesses were evasive, vague and less than credible.

{¶22} The court calculated damages based on the contract amount of 235,000 gallons per day at a rate of $5.13 per 1000 gallons prior to May of 2005, and $5.64 per gallon after May, 2005. The court deducted electrical and chemical costs avoided by East Liverpool. The court did not deduct any amount for labor costs avoided. The court determined that East Liverpool's lower labor costs were not a result of the breach but due to the installation of labor-saving equipment. The court awarded damages in three parts. The court awarded past damages from August of 2004 to March of 2007 in the amount of $1,136,352.39. The court awarded future damages from April of 2007 to December of 2007 in the amount of $344,611.52. The court awarded future damages from January of 2008 to December of 2025 in the amount of $8,233,082.46. These figures were taken from Plaintiff's exhibit 97. The court did not apply the present value discount of 5.08%, also found on Plaintiff's

exhibit 97, because it concluded that the discount would be offset by East Liverpool's right to increase its rates from year to year. The total judgment awarded was $9,714,046.37. A motion for prejudgment interest remained pending, and the court denied the motion on April 30, 2008. This timely appeal followed.

## ASSIGNMENT OF ERROR NO. 1

{¶23} "THE TRIAL COURT ERRED IN FINDING THAT THE DEFENDANT-APPELLANT WRONGFULLY REPUDIATED THE CONTRACT HEREIN."

{¶24} Appellants are actually arguing two basic errors under this assignment of error. The first is based on the trial court's interpretation of a number of aspects of paragraph 5 of the Agreement, which states:

{¶25} "5. The City will deliver the water to the County at a point 113 feet beyond the valve at the Corporation line on Cartwright Street or other points agreeable to both parties. The City will continue to maintain the availability of the present volume and pressure of the water at Cartwright Street." (12/15/95 Agreement, p. 3, ¶5.)

{¶26} Appellants maintained throughout this case that the delivery point for determining "present volume and pressure" was the meter exiting their water tank on Oakmont Avenue, rather than the meter going into the tank. This is obviously different than the delivery point established in the Agreement, which places the point of delivery as 113 feet beyond the valve at the East Liverpool city line at Cartwright Street. This point is before the water enters the tank on Oakmont Avenue. The tank on Oakmont Avenue was a gravity feed tank, meaning that the only force creating water pressure in the tank was the force of gravity. The water meter closest to the

delivery point specified in the Agreement was located just before the water entered the Oakmont tank. Appellants would have us define the "delivery point" as the exit point of the tank, because the water pressure exiting the tank was less than the pressure of the water entering the tank. The water entering the tank was consistently between 46 and 49 psi. The water exiting the tank was closer to 40 psi. It appears that Appellants controlled the water pressure exiting the tank by controlling how much water they released from the tank to their customers, but it has been their belief that East Liverpool was somehow responsible for the lowered pressure at the point where the water exited the tank.

{¶27} It is clear that the Agreement enabled the parties to redefine the delivery point to be at "points agreeable to both parties." Appellants contend that they had an unwritten agreement, or modification of the agreement, that set a different delivery point for the water. They contend that this alternate delivery point did not maintain a pressure of 49 psi and could not keep the Oakmont tank full of water. Appellants have assumed that the parties also agreed to a water pressure of at least 49 psi at this modified delivery point, but this number is not actually found in the Agreement. Appellants' assumption that East Liverpool promised to maintain a pressure of 49 psi is not based on the Agreement, but rather, on supposed assertions and comments made prior to the execution of the Agreement. The Agreement required East Liverpool to keep the pressure at the "present volume and pressure of water," meaning the volume and pressure at the time the contract was signed and executed in December of 1995. According to East Liverpool records, in 1995 this pressure ranged from 46 to 49 psi at the point of entry into the tank. The

records of both East Liverpool and BWD show that the water pressure entering the tank was maintained at or above 46-49 psi after 1995 as well.

**{¶28}** Appellants contend that the trial court should have made the following findings of fact and conclusions of law:

**{¶29}** 1. The contract was not an integrated agreement, and any statements, assertions, or assurances made prior to the signing of the Agreement were not superseded by the terms of the written agreement.

**{¶30}** 2. That East Liverpool made assurances about water pressure prior to executing the contract, and these prior assurances are enforceable.

**{¶31}** 3. The parties agreed that East Liverpool was to measure the water pressure at the point where the water exited the Oakmont tank.

**{¶32}** 4. The water pressure required by the contract was "present volume and pressure," which was at least 49 psi at the time the contract was executed.

**{¶33}** 5. The clause requiring written modifications of the contract is not enforceable.

**{¶34}** 6. The parties orally agreed to modify the delivery point.

**{¶35}** Appellants must successfully establish that the trial court erred as to each of these six factual and legal conclusions in order to establish reversible error on appeal. We do not find any error in these matters.

**{¶36}** First, the contract is, by its own terms, clearly an integrated contract. Paragraph 11 of the contract states:

{¶37} "This agreement shall supersede any and all prior agreements and understandings between the parties hereto, to the full extent as if there had been no such agreements or understandings."

{¶38} There is always a presumption that a written contract is an integration of the parties' complete agreement. This presumption is strongest when there is an integration clause included in the contract itself. *Fontbank Inc. v. CompuServe, Inc.* (2000), 138 Ohio App.3d 801, 808, 742 N.E.2d 674.

{¶39} Further, when the language of the written instrument is clear and unambiguous, the interpretation of the instrument is a matter of law. *Davis v. Loopco Indus., Inc.* (1993), 66 Ohio St.3d 64, 66, 609 N.E.2d 144.

{¶40} The basic principles of contract integration and the intent of the parties subject to a written agreement have been repeated many times by the courts:

{¶41} "In construing any written instrument, the primary and paramount objective is to ascertain the intent of the parties. The general rule is that contracts should be construed so as to give effect to the intention of the parties. *Employers' Liability Assurance Corp. v. Roehm* (1919), 99 Ohio St. 343, 124 N.E. 223, 7 A.L.R. 182, syllabus; *Skivolocki v. East Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374, paragraph one of the syllabus. Where the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions. *Henderson-Achert Lithographic Co. v. John Shillito Co.* (1901), 64 Ohio St. 236, 252, 60 N.E. 295, 298. See, also, *Charles A. Burton, Inc. v. Durkee* (1952), 158 Ohio St. 313, 49 O.O. 174, 109 N.E.2d 265. Intentions not

expressed in the writing are deemed to have no existence and may not be shown by parol evidence. See *Charles A. Burton, Inc.*, supra, at paragraph two of the syllabus; *Steel Sanitary Co. v. Pangborn Corp.* (1930), 38 Ohio App. 65, 70, 9 Ohio Law Abs. 6, 8, 175 N.E. 615, 616-617. There can be no implied covenant in a contract in relation to any matter that is specifically covered by the written terms of the contract. *Kachelmacher v. Laird* (1915), 92 Ohio St. 324, 110 N.E. 933, paragraph one of the syllabus." *Aultman Hosp. Assn. v. Comm. Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53-54, 544 N.E.2d 920.

{¶42} Second, Appellants have failed to establish that the contract included oral assurances about water pressure supposedly made prior to the execution of the written agreement. Strangely, Appellants are attempting to rely on a letter from their own consultant, MS Consultants, Inc., from November 15, 1995 (prior to the execution of the Agreement) stating that East Liverpool could provide water pressure at 49 psi. There simply is no evidence in the record that this letter was incorporated into the Agreement or that East Liverpool bound itself by the terms of Appellants' letter.

{¶43} Third, the contract clearly establishes the delivery point of the water at a location prior to the spot where the water enters the Oakmont tank. East Liverpool provided documentary and oral evidence that the water pressure at the delivery point, with a few minor exceptions (due to water main breaks and road repairs), was kept between 46 psi and 49 psi both prior to and after the execution of the Agreement. Therefore, we can only conclude that East Liverpool complied with the terms of the Agreement.

{¶44} Fourth, Appellants have failed to establish that the parties orally modified the delivery point, or that the parties were permitted to orally modify some other part of the Agreement.  Paragraph 12 of the Agreement states:

{¶45} "This agreement may be modified or amended by written instrument executed in the same manner as this instrument."

{¶46} Appellants argue that the use of the word "may" in paragraph 12 permits written modification, but does not require modifications to be in writing. Appellants argue that other types of modification, such as oral modifications or modifications indicated by the conduct of the parties, are still permitted.

{¶47} Appellants have found only one case supporting their conclusion, an unreported federal district case from California.  *Flores v. Jewels Mktg. & Agribusiness* (E.D.Cal.2007), 2007 U.S. Dist. LEXIS 53127.  There are no cases in Ohio reviewing the precise language used in the modification clause in this appeal. Normally, the principle of expressio unius est exclusio alterius would apply, which means that the expression in a contract of one or more things of a class implies exclusion of all others not expressed.  *Uram v. Uram* (1989), 65 Ohio App.3d 96, 98, 582 N.E.2d 1060.  Thus, the expression that the contract may be modified in writing implies the exclusion of all other types of modification.

{¶48} Even if the contract could be modified orally, whether such a modification had occurred would present a factual matter for the court to decide.  In essence, Appellants are challenging the manifest weight of the evidence, because they disagree with the court's factual findings that the parties did not agree to modify the point of delivery.  A reviewing court employs a very deferential standard when

reviewing the manifest weight of the evidence and generally defers to the factual findings made by the trier of fact. *Pioneer Gazebo, Inc. v. Buckeye Barns, Inc.*, 169 Ohio App.3d 667, 2006-Ohio-6672, 864 N.E.2d 147, ¶6. That is because the trier of fact is in the best position to analyze witnesses and determine their credibility. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. A judgment based upon some competent, credible evidence that speaks to all of the material elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Const. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus. It is apparent that the trial court did not believe Appellants' evidence regarding a supposed oral modification of the Agreement, and we defer to the trial court's conclusions in this matter.

{¶49} Appellants further attempted to prove that there was some type of industry standard defining the typical delivery point of water under a water service agreement. Once again, the court did not believe Appellants' witnesses (and specifically stated it did not in its judgment entry) and did not rely on evidence of an industry standard to establish the delivery point of the water. Therefore, even if Appellants are correct that the Agreement could be orally modified, the evidence did not support that such a modification took place.

{¶50} Appellants' other main argument on appeal is that East Liverpool failed to provide safe water, and thus breached the contract. Appellants argue that the water contained unsafe levels of THMs, which are carcinogens. They contend that unsafe levels of THMs were not an issue when the Agreement was executed in 1995. It is unclear when the OEPA began requiring THM levels below 100 parts per billion,

but this level was maintained by East Liverpool prior to the more stringent standards enacted by the OEPA in 2004. Appellants do not appear to contest the fact that East Liverpool generally met the THM safety standards in its own water supply during the course of the Agreement. Appellants' argument at trial was primarily that East Liverpool's water needed to be treated again with chlorine once it entered the Oakmont tank, and it was this re-chlorination that caused Appellants' water system to have very high levels of THMs, particularly by the time the water reached the furthest areas of the BWD water system. Based on these circumstances, Appellants attempted to attribute the high THM levels to East Liverpool.

{¶51} Appellants attempt to establish reversible error regarding THM levels by referring to a number of facts they believe were proven at trial. In the factual summary of their brief, Appellants assume that the following facts were proven at trial: 1) the quality of the water that reached the Oakmont tank was poor and required BWD to re-chlorinate the water; 2) East Liverpool was responsible for the quality of BWD's water as it exited the Oakmont tank; 3) East Liverpool failed to communicate with Appellants regarding plans to meet new OEPA standards; 4) East Liverpool's records did not adequately reflect true THM levels in the water system; 5) East Liverpool failed to properly monitor its water, and was cited 13 times by the OEPA for failure to monitor; and 6) the OEPA citations themselves constituted a breach of contract.

{¶52} Appellants do not apply these facts to any recognizable argument in their brief. It appears that Appellants are continuing on appeal a line of argument raised at trial about water quality and THM levels, even though this analysis was not

properly included in Appellants' proposed findings of fact and conclusions of law as submitted to the trial court. We agree with the trial court that Appellants' proposed findings and fact and conclusions of law rely on OEPA citations alone, rather than THM levels, to establish East Liverpool's alleged breach of contract. We also agree that the OEPA did not cite East Liverpool for poor water quality, but rather, for failure to consistently monitor, and that such citations in and of themselves do not indicate the quality of the water. The record reflects that Appellants' own expert, Beth Darnell, agreed that East Liverpool satisfied the OEPA standards for THMs both before and after the regulatory changes in 2004. (Tr., Vol. 5, pp. 275-276.) Since neither the OEPA citations, nor the specific evidence in the record about THMs, prove that the water as delivered to Appellants had excessive THM levels, there is no basis for concluding that East Liverpool breached the contract due to contamination by THMs. Finally, as we have already mentioned, the trial court was not inclined to believe much of Appellant's evidence, and we, as a reviewing court, generally defer to the factual findings of the trier of fact.

{¶53} Appellants' arguments are not convincing, and their first assignment of error is overruled.

<u>ASSIGNMENTS OF ERROR NO. 2 & 3</u>

{¶54} "THE TRIAL COURT ERRED IN FINDING LOST PROFIT DAMAGES AGAINST DEFENDANT-APPELLANT BUCKEYE WATER DISTRICT."

{¶55} "THE TRIAL COURT ERRED IN AWARDING FUTURE LOST PROFITS IN THE AMOUNT OF $8,233,082.46."

{¶56} These two assignments of error both deal with the question of damages for lost profits, and will be treated together.

{¶57} Appellants first argue that one political subdivision cannot sue another political subdivision for lost profits. This is a purely legal question that is reviewed de novo on appeal. *Ohio Bell Tel. Co. v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 145, 147, 593 N.E.2d 286.

{¶58} It is a fairly common occurrence for one political entity to sue another political entity over a dispute regarding water. *Hudson v. Summit Cty.*, 97 Ohio St.3d 296, 2002-Ohio-6507, 779 N.E.2d 758; *Richmond Hts. v. Cleveland* (1995), 107 Ohio App.3d 378, 668 N.E.2d 991; *Bd. of Cty. Commrs. of Wood Cty. v. City of Toledo* (Sept. 24, 1993), 6th Dist. No. 92WD086; *City of Middletown v. Bd. of Cty. Commrs. of Butler County* (Sept. 16, 1992), 12th Dist. No. CA 91-06-113; *Village of Plymouth v. City of Willard* (1988), 47 Ohio App.3d 46, 546 N.E.2d 1372. This Court itself has had a number of cases involving one political subdivision suing another political subdivision in order to obtain the full benefit of the bargain in a water contract dispute. See, e.g., *Jefferson Cty. Bd. of Commrs. v. Smithfield*, 7th Dist. No. 05-JE-38, 2006-Ohio-6242; *Steubenville v. Wintersville*, 168 Ohio App.3d 430, 2006-Ohio-4381, 860 N.E.2d 797. Furthermore, the Ohio Supreme Court has affirmed the principle that a municipality is entitled to recover the full benefit of its bargain when it enters into water contracts outside the municipality and when that contract is later breached. *Fairway Manor, Inc. v. Bd. of Commrs. of Summit Cty.* (1988), 36 Ohio St.3d 85, 90, 521 N.E.2d 818.

{¶59} In none of these cases has it ever been questioned that the political subdivision was entitled to the full benefit of its bargain, whether or not that bargain included some measure of profit. For example, in the *Smithfield* case, Jefferson County was suing the Village of Smithfield for the full amount of the agreed upon water rate because Smithfield had simply stopped paying for the water. Smithfield had agreed to pay $3.00 per 1000 gallons under an oral agreement with Jefferson County. At trial, the Village of Smithfield argued that the rate was only $2.00 per 1000 gallons, but the trial court held in favor of Jefferson County and awarded damages of $267,354.24 plus interest. We upheld the judgment of trial court, agreeing that Jefferson County was entitled to the full benefit of its bargain of $3.00 per 1000 gallons, even though the water supply agreement had not been reduced to writing.

{¶60} Appellants have pointed to one case to support their view that a political entity cannot obtain lost profit damages from another political entity. In *Cementech, Inc. v. City of Fairlawn*, 109 Ohio St.3d 475, 2006-Ohio-2991, 849 N.E.2d 24, an unsuccessful bidder for a road construction contract sued the City of Fairlawn for injunctive relief and damages for improperly disqualifying its bid. The trial court denied injunctive relief and the contract was awarded to the lowest bidder. The trial court determined before trial that Cementech could recover its cost of bid preparations, but nothing more, should it prevail on its claims of violations of the competitive bidding process. The jury found in favor of Cementech but only awarded the cost of bid preparations as damages. The Ninth District Court of Appeals reversed the trial court and allowed Cementech to receive additional damages for lost

profits. The case then proceeded to the Ohio Supreme Court as a conflict case on the following question: "Does the availability of injunctive relief if timely filed but denied preclude an award of lost profits in a municipal contract case?" Id. at ¶8.

{¶61} Before discussing the reasoning or disposition of the *Cementech* case, it should already be clear that it is inapposite to the instant appeal. First, the *Cementech* case involved a private contractor suing a political subdivision, not two political subdivisions in a contract dispute with each other. Second, the case involved the very specific area of law surrounding competitive bidding for government contracts, which has nothing to do with the facts of the instant appeal. Third, the question under review was whether the remedy of injunctive relief was an adequate remedy for the contractor whose bid had been wrongly rejected. The Supreme Court determined that injunctive relief was the only relief available to a wronged bidder to insure that public contracts are awarded fairly and according to law. Id. at ¶10. The instant appeal has nothing to do with injunctive relief or the availability of injunctive relief as an alternative or adequate remedy.

{¶62} *Cementech* held that the bidder could not recover lost profit damages after it had failed to appeal the denial of its motion for injunctive relief. The Court rejected the idea that denying lost profit damages would allow government entities to ignore state and local laws governing competitive bidding. The Court reasoned that forcing municipalities and governmental entities to pay lost profit damages to unsuccessful bidders would, in effect, punish the citizens and the general public, and those were the people who were supposed to be protected by the competitive bidding laws in the first place. Id. at ¶12. The final holding of the case is as follows:

"[W]e hold that when a municipality violates competitive-bidding laws in awarding a competitively bid project, the rejected bidder cannot recover its lost profits as damages." Id. at ¶14.

**{¶63}** *Cementech* has little or no application to the instant appeal. East Liverpool is not a private entity suing a government entity. This case involves two public entities in a dispute over a long-term water contract. Appellants are rightfully concerned about protecting the rights of the citizens who are affected by the implementation, interpretation, and breach of the water supply Agreement. We must also keep in mind that it is not only BWD's customers that are affected by this case. The rights of the citizens of East Liverpool should also be taken into account. East Liverpool's citizens have an interest in recovering the value of the water contract duly authorized by its elected officials. There is no particular reason why the interests of the citizens represented by the Board of County Commissioners or by BWD should take precedence over the interests of the citizens of East Liverpool. The *Cementech* case, a dispute between a private contractor and a government entity, presents no dispositive principles of law that can be applied to the instant appeal.

**{¶64}** Appellants continue their argument with the notion that the parties did not contemplate damages in the form of lost profits. This argument is not persuasive. Nothing in the Agreement precludes East Liverpool from being awarded any type of damages that would normally arise in a breach of contract case. "Damages for a breach of contract are those which are the natural or probable consequence of the breach of contract or damages resulting from the breach that were within the contemplation of both parties at the time of the making of the contract." *The Toledo*

*Group, Inc. v. Benton Industries, Inc.* (1993), 87 Ohio App.3d 798, 806, 623 N.E.2d 205.

**{¶65}** Unless the contract dictates otherwise, the non-breaching party is entitled to recover as damages, "the contract price for full performance reduced only by the amount that defendant's breach saved plaintiff, i.e., the value to plaintiff of the relief from full performance." *Channel Dry, Inc. v. Haver* (1990), 70 Ohio App.3d 197, 203, 590 N.E.2d 868. The amount of the non-breaching party's cost savings to be deducted from the contract price does not include that party's ongoing and fixed overhead costs. *Digital & Analog Design Corp. v. North Supply Co.* (1989), 44 Ohio St.3d 36, 40-41, 540 N.E.2d 1358. "[W]here there would have been no additional costs to the party to generate those profits which he lost, or where he was in fact not relieved from the particular costs which constituted his ongoing and fixed overhead costs, then he need only assert and prove such circumstances." Id. at 41.

**{¶66}** Since the law of Ohio is that a party may recover the full benefit of the bargain, less costs saved from being relieved of performance, that law became part of the underlying assumptions of the Agreement. Therefore, there is no basis for Appellants to argue that lost profits were not contemplated by the parties when they signed the agreement. The parties contemplated that ordinary contract law would govern the interpretation of the Agreement, and ordinary contract law allows for lost profits.

**{¶67}** Appellants also challenge the trial court's factual determinations as to what expenses should have been deducted from the contract price to determine damages. Appellants contend that East Liverpool's expenses must have been much

greater than the amounts submitted by East Liverpool. It is clear from the record that the trial judge was not inclined to believe Appellants' evidence of costs saved due to the breach. The trial court specifically noted, "the lack of credibility displayed by many of the Water District's witnesses." (Emphasis omitted.) (2/13/08 J.E., p. 11.)

**{¶68}** East Liverpool provided evidence that it saved electrical and chemical costs of $79,585.48 for the period between July of 2004 and December of 2007. This amount was deducted from the damages award. East Liverpool also calculated that $28,377.53 should be deducted each year of future damages for these same saved expenses. These costs were also deducted. Appellants claim that the court should also have deducted an additional $289,343.98 annually because of reduced labor costs due to layoffs. Appellants contend that these layoffs were due to their beach of contract. The court determined that East Liverpool had installed a gear switch to automate the work done by the laborers who had been laid off. The court attributed the layoffs as due to automation upgrades and not due to Appellants' breach of the contract. The record supports the calculations and deductions taken by the trial court, and there is no basis for overturning the court's factual determinations.

**{¶69}** Appellants mention in passing that the Agreement entitled them to a 20% discount in any future damages award because the Agreement allows them to deduct up to 20% of unbilled water as lost water. This statement is not quite correct. Although the Agreement does allow for a deduction of up to 20% in water that registered at the main water meter but was not actually billed to Appellants' customers, i.e., lost water, that provision does not negate the requirement that Appellants purchase at least 235,000 gallons of water per day. As is shown by

attachment "A" to the Agreement, the 20% deduction only applied after Appellants had met their 235,000 gallon daily minimum. Since the damage award is only for the minimum 235,000 gallons per day, the 20% deduction would not apply.

**{¶70}** Appellants present us with a series of calculations and conclude that East Liverpool had an annual savings of $192,067.73. Appellants contend that this amount should also have been deducted from the damage award. This figure is supposedly derived from testimony given by Robert Disch, the East Liverpool Utilities Director. It is difficult to decipher the assumptions built into Appellants' calculations. What is clear is that any factual underpinnings supporting Appellants' calculations were not accepted by the trial court. The trial court, as the trier of fact, examined East Liverpool's expenses and determined that electrical and chemical costs were valid cost savings and should be deducted from the damages award. It is inconsequential that Appellants believe that other facts were clearly established at trial. The trial judge was the trier of fact, and the trial judge came to very different factual conclusions than those proposed by Appellants. A reviewing court normally defers to the factual findings of the trier of fact when there is some competent, credible evidence to support those findings. *C.E. Morris Co. v. Foley Const. Co.*, supra, 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus. The extensive record of this case, arising out of a lengthy trial spread out over four months, contains ample evidence to support the trial court's findings and verdict.

**{¶71}** Appellants also argue that the rate East Liverpool was charging for water was unconscionable. Appellants believe East Liverpool raised its rates by 23%, and then again by 10%, in retaliation for the expected loss of revenue from

BWD. As we will discuss below, Appellants are undoubtedly correct to some extent, but this does not make the rate hikes unconscionable under the terms of the Agreement. The Agreement does not require East Liverpool to explain or justify its rate increases. The Agreement does not prohibit East Liverpool from adjusting its rates based on changes in the overall volume of water that it is selling. The fact that the rate being charged to BWD is the same rate being charged to East Liverpool's own residents also negates any claim of unconscionability. The Agreement allows East Liverpool to raise its rates, and thus, rate increases are part of the benefit of the bargain in this case.

**{¶72}** Appellants also argue that lost profits are too speculative in this case to be awarded. Lost profits must be demonstrated with reasonable certainty in a breach of contract case, and speculative damages are not recoverable. *Gahanna v. Eastgate Properties, Inc.* (1988), 36 Ohio St.3d 65, 68, 521 N.E.2d 814. This case, though, does not involve a calculation of speculative lost profits. This case is based on a contract price for water that is defined in the contract. The volume of water is defined. The price is defined, or at least calculable with relative ease. There is no need to speculate about lost profits when the contract price is made explicit in the contract. East Liverpool has never attempted to recover speculative lost profit damages. It has, from the beginning of this case, claimed as damages the contract price for full performance, less costs saved, as defined in *Channel Dry, Inc. v. Haver*, supra.

**{¶73}** We have found no error in the award of lost profits damages or in the calculations used to deduct East Liverpool's cost savings arising from the breach. Therefore, we overrule Appellants' second assignment of error.

**{¶74}** Appellants' final argument is that the trial court should have taken future inflation into account and should have reduced the future damages to present value. Appellants assert that the trial court should not have considered East Liverpool's right to raise water rates from year to year as the determinative factor in offsetting the discount rate with presumed future inflation. Appellants cite *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 425, 644 N.E.2d 298, in support of their argument.

**{¶75}** We agree with Appellants that the future damages award should have been reduced to current value. The Ohio Supreme Court, in *Galayda*, has held:

**{¶76}** "In Ohio, a plaintiff is entitled to an award of damages to compensate him for losses which he is reasonably certain to incur in the future. *Pennsylvania Co. v. Files* (1901), 65 Ohio St. 403, 407, 62 N.E. 1047, 1047; *Roberts v. Mut. Mfg. & Supply Co.* (1984), 16 Ohio App.3d 324, 16 OBR 355, 475 N.E.2d 797. Under the common law of Ohio, future damages must be reduced to present value, and a defendant is entitled to a jury instruction to that effect. *Maus v. New York, Chicago & St. Louis RR. Co.* (1956), 165 Ohio St. 281, 59 O.O. 366, 135 N.E.2d 253, paragraph one of the syllabus. Thus in Ohio, a jury is to return a verdict not in an amount reflecting the actual damages it deems to be reasonably certain to occur in the future, but rather in a reduced amount representing the present value of those actual damages." *Galayda*, supra, 71 Ohio St.3d at 425, 644 N.E.2d 298.

**{¶77}** The purpose of reducing an award to present value is to fairly (rather than excessively) compensate the prevailing party now for losses that are anticipated to take place in future. " 'It is self-evident that a given sum of money in hand is worth more than the like sum of money payable in the future.' " *St. Louis Southwestern Ry. Co. v. Dickerson* (1985), 470 U.S. 409, 412, 105 S.Ct. 1347, quoting *Chesapeake & Ohio R. Co. v. Kelly* (1916), 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117. Failure to account for the difference between the present and the future value of the money being awarded is, in essence, awarding a court-sanctioned windfall to the plaintiff. "[I]f the award is to compensate for a loss of profits projected over 10 years, the amount should be that which, if invested for 10 years at appropriate (probably conservative) rates of return, would produce the amount of the loss. An award today of the amount that would be earned 10 years hence will give plaintiff more than is necessary to make plaintiff whole." R. Dunn, Recovery of Damages for Lost Profits 5th (1998) 501-502, Section 6.25.

**{¶78}** The calculation of the present value of a future award is generally left to the province of the trier of fact. *Sahrbacker v. Lucerne Products, Inc.* (1990), 52 Ohio St.3d 179, 179, 556 N.E.2d 497. The failure of a party to present evidence of present value does not remove the question from the trier of fact. Id. In this case, East Liverpool proposed that the trial court apply a 5.08% discount rates based on the current rates being earned on 10-year United States Treasury notes. The rate of return on a 10-year Treasury note is considered to be a conservative, risk-free discount rate for reducing future damages to current value. R. Dunn, Recovery of Damages for Lost Profits 5th (2005 Supplement) 191, Section 6.25.

**{¶79}** The trial court stated that it would not apply a present value discount because this amount would be offset by East Liverpool's contractual right to raise water rates. The trial court appears to be concluding that East Liverpool would periodically raise its water rates over the remaining years of the Agreement to keep up with general economic inflation, and that these increases would offset the effect of applying a 5.08% discount rate to the future damages award. The trier of fact may take into account the full effects of inflation when attempting to reduce a future award to present value. *Burlington Group, Inc. v. Chardon Lakes Inn Restaurant, Inc.* (Mar. 24, 1995), 11th Dist. No. 94-G-1839.; see, also, *Webster v. Oglebay Norton Co.* (Jan. 26, 1995), 8th Dist. No. 65502. Nevertheless, there are a number of problems with the trial court's conclusion. First and foremost is the directive from the Ohio Supreme Court in *Galayda* that future damages must be reduced to present value. Unless there was some compelling reason to do otherwise, the trial court was bound to apply the holding of an Ohio Supreme Court case that was directly on point regarding the reduction of future damages to present value.

**{¶80}** Second, there was no specific evidence admitted at trial designed to establish a value for inflation with respect to future damages. The record contains evidence reflecting the actual rate hikes instituted by East Liverpool in the past, but there was no evidence that these rate hikes had anything to do with general economic inflation or that they reflected anticipated future inflation. We are not inclined to ignore or distinguish the holding of an Ohio Supreme Court case based on a vague and unsupported assumption about future inflation rates.

**{¶81}** Third, it is generally accepted that the process of reducing future damages to current value takes into account much more than the general effect of inflation on the future value of money. The United States Supreme Court has reasoned that: "[E]ven in an inflation-free economy the award of damages to replace the lost stream of income cannot be computed simply by totaling up the sum of the periodic payments. For the damages award is paid in a lump sum at the conclusion of the litigation, and when it-or even a part of it-is invested, it will earn additional money." *Jones & Laughlin Steel Corp. v. Pfeifer* (1983), 462 U.S. 523, 536, 103 S.Ct. 2541, 76 L.Ed.2d 768. Thus, even if we assume that East Liverpool's water rates will keep up with inflation, the future damages award would still need to be reduced to present value to account for the investment value of those dollars.

**{¶82}** Fourth, the trial court's assumption that water rates would rise at an inflationary rate equal to the proposed 5.08% discount rate fails to account for other aspects of inflation. One would expect that inflation would also affect the expenses East Liverpool incurs in obtaining, processing and delivering its water. These expenses would normally be deducted from any future damages award. Inflation would affect the wages of East Liverpool's employees, the costs of capital improvements, the costs of materials involved in processing the water passing through East Liverpool's water treatment system, etc. One would expect that the inflationary effects of increased income from higher water rates would be offset by these increased expenses, thereby eliminating the need to make any adjustment to the discount rate at all due to inflation.

**{¶83}** Fifth, the record reveals that East Liverpool instituted substantial rate hikes well after the conflict had arisen with Appellants and after they filed their complaint. The dispute between the parties intensified in 2002 with Appellants' various complaints about water pressure. The dispute came to a turning point on March 21, 2003, when BWD served notice that it considered East Liverpool to be in breach of the Agreement. Then, on September 24, 2003, BWD notified East Liverpool that it was going to be using alternative sources for its water. As a result, on November 20, 2003, East Liverpool raised the water rates from $4.18 to $5.13. East Liverpool filed its contract complaint on May 19, 2005. It subsequently raised its rates again May 31, 2005, from $5.13 to $5.64. Thus, from 2003 to 2005, East Liverpool raised its rates by $1.46, constituting a 35% increase. These two major rate increases took place after it became clear that Appellants did not intend to abide by the terms of the Agreement and would no longer be purchasing water from East Liverpool. Although we have concluded that the rate hikes were not unconscionable or prohibited by the Agreement, they are integrally related to the dispute between the parties and must be treated as a factor in computing damages. It would appear that East Liverpool has already taken future inflation into account by drastically increasing their rates prior to the resolution of this contract dispute.

**{¶84}** The long-term nature of the Agreement presents an additional reason to reduce the award to present value. Future damages in long-term contracts present a particular set of problems for the courts. "Most courts considering a claim of lost profits damages arising from a long-term contract have reduced the term for which damages may be recovered." R. Dunn, Recovery of Damages for Lost Profits 5th

(1998) 488, Section 6.19. Perhaps the most extreme example of a plaintiff attempting to receive long-term breach of contract damages can be found in *Palmer v. Connecticut Railway & Lighting Co.* (1941), 311 U.S. 544, 61 S.Ct. 379, 85 L.Ed. 336. In *Palmer*, a lessor of railway property sought breach of contract damages for 969 years remaining on a 999-year lease. The plaintiff conceded at trial that any evidence of value beyond 40 years would be "too uncertain." Id. at 552, 61 S.Ct. 379, 85 L.Ed. 336. The plaintiff presented evidence that their damages over 40 years would be approximately $20 million. Id. This amount had been reduced to present value by applying a four per cent discount rate. The United States Supreme Court rejected the plaintiff's calculations and only approved of damages of $4.4 million extending eight years into the future. No particular rationale was given as to why eight years was an acceptable length for future damages as opposed to 20 or 30 or 40 years. It is interesting to note that the *Palmer* Court rejected long-term future damages even with the application of a four per cent discount rate. In the instant case, the trial court awarded future damages for the 18 remaining years of a 25-year contract, and failed to apply a discount rate to reduce the future damages to present value. This juxtaposition of long-term damages and failure to apply a discount rate is a troublesome combination and reinforces our conclusion that we should strictly follow the basic principle outlined in *Galayda* in this particular case and apply a 5.08% discount rate to the future damages award.

**{¶85}** Hence, we find merit in Appellants' third assignment of error, and we will modify the judgment to take into account a 5.08% discount rate.

{¶86} In conclusion, we find that Appellants have raised essentially two errors on appeal. The first is a challenge to the trial court's conclusion that East Liverpool did not breach the water supply agreement. The record reflects that East Liverpool provided adequate volume and pressure of water to the Oakmont water tank. The record also reflects that East Liverpool delivered potable water to Appellants that met OEPA standards. East Liverpool did not breach the Agreement, and thus, it was entitled to receive damages for Appellants' breach. The second challenge to the judgment was the issue of the calculation of damages. Appellants did not establish any error with respect to the expenses deducted from the damages award, or with respect to the calculation of future damages. We do find reversible error in the trial court's decision not to apply a discount rate to reduce the future damages to present value. Taking into account a variety of factors, including an express holding by the Ohio Supreme Court in *Galayda*, the lack of evidence of future inflationary effects, the failure to account for all aspects of inflation, the dramatic increases in East Liverpool's water rates starting in 2003, and the fact that the Agreement in question was a long-term contract, we conclude that the trial court should have reduced the future damages award to present value. East Liverpool proposed a discount rate of 5.08% to reduce the award to present value, and this is the rate that should have been applied. The trial court's judgment is hereby modified to reflect the application of a 5.08% discount rate. Past net damages are affirmed in the amount of $1,136,352.39. This includes damages for the period from August 2004 through March 2007. Future net damages, after applying a 5.08% discount rate as described in Plaintiff's exhibit 97, are modified to $3,706,400.60. This includes the period from

April 2007 to December 2025. The total amount of the judgment is modified to $4,842,752.99.

Donofrio, J., concurs.

DeGenaro, J., concurs.