[Cite as *Girard Technologies, Inc. v. Stiles*, 2025-Ohio-4869.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

GIRARD TECHNOLOGIES INC. ET AL.,

Plaintiffs-Appellants,

v.

RICHARD STILES ET AL.,

Defendants-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 MA 0030**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2023 CV 02260

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Rick L. Brunner, Atty. Patrick M. Quinn* and *Atty. Ashtin N. Romesberg,* Brunner Quinn, for Plaintiffs-Appellants and

*Atty. John N. Zomoida, Jr.,* Anthony & Zomoida, for Defendants-Appellees.

Dated:  October 23, 2025

**DICKEY, J.**

{¶1}    Appellants, Girard Technologies, Inc., dba Got 2 Go Towing, and Got to Go Towing and Recovery, Inc., appeal from the March 4, 2025 judgment of the Mahoning County Court of Common Pleas overruling their objection, adopting a magistrate's decision, and entering judgment in favor of Appellees, Richard Stiles ("Richard"), Blood Bros. Trucking LLC ("Blood Bros."), and Stacy Ferro ("Stacy"), following a bench trial before the magistrate.  On appeal, Appellants assert the trial court erred in adopting the magistrate's decision.  Appellants raise issues involving whether the law of gifts, conversion, and replevin apply.  Appellants allege the court erred in finding they failed to plead their claim as to Stacy, a notary public.  Appellants also contend the court erred in finding that Richard did not commit conversion over Appellants' property, i.e., tools. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2}    Richard and Alex Bugno ("Alex") are half-brothers.  Elizabeth Bugno ("Elizabeth") is the mother of Richard and Alex.  Elizabeth is married to Christopher Bugno ("Chris").  Chris is Alex's father and Richard's stepfather.

{¶3}    The real property, located at 1101 East Indianola Avenue in Youngstown, Mahoning County, Ohio (the "Indianola Property"), was purchased by Chris and Chris' brother, Robert Bugno ("Robert"), in 1984.  After Robert's death, his interest in the Indianola Property was acquired by his wife, Colleen Bugno ("Colleen").

{¶4}    Girard Technologies, Inc. is a corporation that was formed in Minnesota on October 14, 1998.  Alex purchased the shares in Girard Technologies, Inc. in 2015 and is the sole shareholder.  On May 16, 2016, Girard Technologies, Inc. registered to transact business in Ohio.  On October 27, 2016, Girard Technologies, Inc. registered the fictitious name "Got 2 Go Towing" with the Ohio Secretary of State listing Matthew Bugno ("Matthew") as the agent.  Got to Go Towing and Recovery, Inc. was formed in Oklahoma on May 23, 2017.  On February 8, 2018, Got to Go Towing and Recovery, Inc. registered to transact business in Ohio.  Got to Go Towing and Recovery, Inc. is a wholly owned subsidiary of Girard Technologies, Inc.  Girard Technologies, Inc. and Got to Go Towing and Recovery, Inc. operated a towing company at the Indianola Property.

Case No. 25 MA 0030

{¶5}    On October 16, 2018, Chris filed an action against Colleen to partition the Indianola Property.  In July 2019, Chris and Colleen settled their dispute.  The settlement agreement required Chris to pay Colleen $20,000 for her interest in the Indianola Property.  Chris obtained a loan with OneMain Financial.  The proceeds from the loan were deposited into a checking account for Girard Technologies, Inc. The proceeds from the loan were not paid to Colleen.

{¶6}    Chris and Elizabeth asked Richard to purchase Colleen's interest in the Indianola Property.  Richard paid $20,000 to Colleen to acquire her interest in the Indianola Property.  At Elizabeth's request, Richard also paid off Chris' loan with OneMain Financial.

{¶7}    On January 15, 2020, Alex was found guilty on 14 counts of compelling prostitution and one count of pandering obscenity involving minors.  Alex was sentenced to serve 17 years in prison.  As a result of Alex's convictions, Appellants ceased operations of the towing company.  Several commercial vehicles used in the towing business were encumbered by liens and were on the verge of being repossessed.  Alex, Elizabeth, and Chris asked Richard to continue operation of the towing company.

{¶8}    Blood Bros. is an Ohio limited liability company.  The owners of Blood Bros. are Richard Stiles and Joseph Romeo ("Joseph").  On May 11, 2020, Blood Bros. registered the fictitious name "Got to Go Towing Recovery & Automotive Services."  In explaining why Blood Bros. registered a fictitious name so close to Appellants', Richard testified as follows:

> **THE COURT:** It's also the same name of the other plaintiff, Got to Go Towing and Recovery . . .
>
> And it's very close to the trade name that was reported and used by Girard Technologies, wasn't it?
>
> **[RICHARD]:** Indeed it was. For the reason that Mr. Bugno, both of them and my mother said, you need to keep this name. It's going to help you so much. You need to keep the name. Just like the phone number. I

needed to keep the phone number. I needed to keep everything because they wanted me to succeed. And they said it was so established.

(8/13/2024 Bench Trial Tr., p. 38-39).

**{¶9}** When Appellants ceased operations, they owned the following vehicles: 2013 Hyundai Sonata; 2012 Volkswagen Jetta; 2010 Chevrolet Malibu; 1998 GMC Sonoma; 1995 Ford F150; 2005 Toyota Prius; and 2005 Mercedes Benz SL (the "Junk Vehicles"). Appellants did not pay anything for the Junk Vehicles. Appellants obtained the Junk Vehicles after they were towed and never claimed. The Junk Vehicles were in poor condition and some had salvage titles.

**{¶10}** Chris had power of attorney on behalf of Appellants. On June 22, 2020, Chris gave the titles for the Junk Vehicles to Richard and called his brother, Matthew. Chris told Richard and Matthew to cause the transfer of the titles to Richard and/or Blood Bros. Matthew, as the agent of Got 2 Go Towing, executed the titles on behalf of Appellants in the presence of Stacy. The Junk Vehicles were transferred to Richard. Stacy notarized the title transfers. Richard and/or Blood Bros. paid off the loans on multiple vehicles used by Appellants to operate the towing business and the titles were later sold.

**{¶11}** The parties disagree over the circumstances that lead to the transfers. Richard testified as follows:

> **[ATTORNEY ZOMOIDA]:** Can you explain to the court how the transfer of those vehicles came about?
>
> **[RICHARD]:** Chris approached me and said that these vehicles need to come out of Girard Technologies' name. And he couldn't put them, I guess couldn't put them in his name, or whoever's name. And told me to put it in my name or into my company.
>
> He didn't care if I put them in my name or my company name. He just wanted them out of Girard Technologies' name. And [then] he contacted Matthew Bugno, his brother. And Matthew Bugno -- and told him --

**[ATTORNEY ZOMOIDA]:** You were present at this time?

**[RICHARD]:** I was standing right next to him.

**[ATTORNEY ZOMOIDA]:** Okay.

**[RICHARD]:** When he called --

**[ATTORNEY ZOMOIDA]:** And what did he say -- what did you hear him say to Matthew?

**[RICHARD]:** Matthew, I need you to sign these titles because you're the one that's supposed to sign for these titles, you know, for Girard Technologies. . . .

. . .

**[ATTORNEY ZOMOIDA]:** Okay. So Chris handed you the title?

**[RICHARD]:** Yes.

**[ATTORNEY ZOMOIDA]:** And what happened?

**[RICHARD]:** Me and Joe got in my truck. Drove over -- picked up Stacy. Went up --

**[ATTORNEY ZOMOIDA]:** The defendant, Stacy Ferro?

**[RICHARD]:** Yes. And then we drove past the shop. His brother lives a block away from the shop. We pulled up. Matthew came out. Matthew went over everything, signed his name on each title. She notarized them.

And then we took them down to the Bureau of Motor Vehicles and had them transferred into our company.

(8/13/2024 Bench Trial Tr., p. 141-143).

Case No. 25 MA 0030

{¶12} Disputes arose among Chris, Elizabeth, and Richard in August 2020. As a result, Blood Bros. ceased operation of its towing business and Richard prohibited Chris from accessing the Indianola Property, which contained various tools. Blood Bros. had access to computers that were formerly used by Appellants to operate their towing business.

{¶13} On February 5, 2021, Richard filed an action against Chris to partition the Indianola Property, which the parties later settled. Pursuant to the settlement, Chris purchased Richard's interest in the Indianola Property and Richard returned the tools that he had from that property. Chris had previously filed a Chapter 7 bankruptcy. Chris indicated the tools at the Indianola Property were purchased by Appellants through his bankruptcy. However, there were no assets liquidated by the trustee.

{¶14} On April 22, 2022, Appellants filed suit against Appellees in the U.S. District Court, Northern District of Ohio, Eastern Division, Case No. 4:22CV655. On September 11, 2023, Appellants voluntarily dismissed the federal suit in its entirety.

{¶15} On November 7, 2023, Appellants refiled suit against Appellees and Youngstown Towing LLC, but this time in the Mahoning County Court of Common Pleas, raising nine counts: (1) declaratory judgment; (2) further relief, R.C. 2721.09; (3) further equitable relief; (4) replevin; (5) conversion; (6) recovery of loan proceeds; (7) intentional acts; (8) fraud; and (9) equitable accounting. In their complaint, Appellants alleged that Richard and/or Blood Bros. intentionally, fraudulently, and illegally obtained possession of and/or used Appellants' property including but not limited to the Junk Vehicles, various tools, and computers. Appellants also alleged that Stacy notarized the titles without requesting or being presented with any documents from Appellants authorizing the transfers.

{¶16} On March 13, 2024, Appellees filed answers. Default judgment was entered against Youngstown Towing LLC due to its failure to answer or otherwise respond to Appellants' complaint. Pursuant to the parties' stipulation, the trial transcript and relevant records from the related federal case were submitted into the record.

{¶17} The matter proceeded to a bench trial before the magistrate on August 13, 2024. The pertinent testimony at issue in this appeal is addressed above as well as under Appellants' assignments of error. The magistrate filed an eight-page decision on

November 18, 2024, entering judgment in favor of Appellees. Appellants filed an objection.

{¶18} On March 4, 2025, the trial court overruled Appellants' objection, adopted the magistrate's decision, and entered judgment in favor of Appellees, specifically stating:

> [T]he Court finds that Plaintiffs have not satisfied their burden of proof on any of the claims in their complaint. Specifically, the titles for the Vehicles were transferred to "Got to Go Towing Recovery & Automotive Services" at the instruction of Chris, who had power of attorney for Plaintiffs. Consequently, Plaintiffs have not sufficiently proven that the titles for the Vehicles were transferred to "Got to Go Towing Recovery & Automotive Services" without Plaintiffs' knowledge and/or consent.

> Additionally, the Court finds that Plaintiffs have not sufficiently proven their ownership of the tools allegedly taken by Richard and/or Blood Bros. Plaintiffs did not provide the Court with any evidence to support its ownership of the tools. According to Chris' testimony, Plaintiffs acquired the tools through Chris' bankruptcy. However, the docket from Chris' bankruptcy case clearly shows that ownership of the tools could not have been transferred through Chris' bankruptcy because no assets were liquidated by the trustee in Chris' bankruptcy. As a result, the Magistrate cannot determine whether the tools are owned by Plaintiffs or Chris, who is not a party to this case.

> Finally, the Court finds that Plaintiffs' computers have been returned to Plaintiffs and that any use of the computers, and/or any other personal property belonging to Plaintiffs, by Richard and/or Blood Bros. was done with Plaintiffs' knowledge and consent.

> THEREFORE, IT IS ORDERED that judgment is hereby entered in favor of Defendants, Richard Stiles, Blood Bros. Trucking Limited Liability Company, and Stacy Ferro. Costs to Plaintiffs.

Case No. 25 MA 0030

IT IS SO ORDERED.

(3/4/2025 Judgment Entry, p. 7-8).

**{¶19}** Appellants filed a timely appeal. Although Appellants list two assignments of error under the "Table of Contents" and six assignments under the "Tables of Authorities," Appellants actually argue three assignments under the "Argument" section in its brief. *See* (6/23/2025 Appellants' Brief, p. ii, iv-vi, 3, 10, 12).

## ASSIGNMENT OF ERROR NO. 1

## THE TRIAL COURT ERRED IN ADOPTING THE MAGISTRATE'S DECISION.

## ASSIGNMENT OF ERROR NO. 3

## THE TRIAL COURT ERRED IN FINDING THAT DEFENDANT, RICHARD STILES DID NOT COMMIT CONVERSION OVER PLAINTIFF, GIRARD TECHNOLOGIES, INC.'S PROPERTY, I.E., TOOLS.

**{¶20}** In their first assignment of error, Appellants contend the trial court erred in adopting the magistrate's decision. Appellants advance three issues: (1) "Whether the law of gifts is applicable in [this] case"; (2) "Whether the trial court erred in finding that conversion was not applicable in this matter"; and (3) "Whether the trial court erred in finding that the law of replevin was not applicable in this matter." (6/23/2025 Appellants' Brief, p. 3, 8, 9).

**{¶21}** In their third assignment of error, Appellants assert the trial court erred in finding Richard did not commit conversion over Appellants' property, i.e., tools. Appellants advance one issue: "Whether the trial court committed error by finding that Plaintiffs have not provided the Court with any evidence to support its ownership of the tools." (6/23/2025 Appellants' Brief, p. 12).

**{¶22}** Appellants' first and third assignments of error both take issue with the alleged illegal taking of their property by Richard and/or Blood Bros. Appellants essentially challenge the trial court's finding that they did not overcome their burden of

Case No. 25 MA 0030

proof in showing that their assets were illegally taken by Richard and/or Blood Bros. For ease of discussion, we will address these assignments and issues together.

> The plaintiff in a civil case has the burden to prove that she is entitled to recover by a preponderance of the evidence. *Alazaus v. Haun* (March 29, 2001), 7th Dist. No. 740. A preponderance of the evidence requires the plaintiff to establish, "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not . . . or evidence which is more credible and convincing to the mind." *Id.* at 1, citing Black's Law Dictionary (6th Ed. Abr.1991) 819.

*Jones v. Johns Plumbing*, 2005-Ohio-4684, ¶ 9 (7th Dist.).

> When reviewing civil appeals from bench trials, an appellate court applies a manifest weight standard of review. *Revilo Tyluka, L.L.C. v. Simon Roofing & Sheet Metal Corp.*, 193 Ohio App.3d 535, 2011-Ohio-1922, 952 N.E.2d 1181 (8th Dist.), citing App.R. 12(C), *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). Judgments supported by some competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus (1978). See, also, *Gerijo, Inc. v. Fairfield*, 70 Ohio St.3d 223, 226, 638 N.E.2d 533 (1994). Reviewing courts must oblige every reasonable presumption in favor of the lower court's judgment and finding of facts. *Gerijo*, 70 Ohio St.3d at 226, 638 N.E.2d 533 (citing *Seasons Coal Co.*, supra). If the evidence is susceptible to more than one interpretation, then we must construe it consistently with the lower court's judgment. *Id.* In addition, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. *Kalain v. Smith*, 25 Ohio St.3d 157, 162, 495 N.E.2d 572 (1986).

*Bova v. B & J Pools, Inc.*, 2023-Ohio-1680, ¶ 36 (7th Dist.).

**{¶23}** "With respect to sufficiency of the evidence, "'sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury [or factfinder] or whether the evidence is legally sufficient to support the jury [or factfinder's] verdict as a matter of law.' Black's Law Dictionary (6 Ed.1990) 1433." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

**{¶24}** Appellants believe the trial court "erroneously failed to hold that Richard Stiles' claim that the property of Plaintiff was gifted to him by either Alex Bugno, his mother, or his step father but does not satisfy the legal requirements for a gift." (6/23/2025 Appellants' Brief, p. 4). Appellants further believe the court "erroneously held that [they] did not prove that the vehicle titles were transferred without their knowledge or consent, and was unsupported by the evidence presented." (*Id.*)

> The essential elements of an *inter vivos* gift are "(1) an intention on the part of the donor to transfer the title and right of possession of the particular property to the donee then and there and, (2) in pursuance of such intention, a delivery by the donor to the donee of the subject-matter of the gift to the extent practicable or possible, considering its nature, with relinquishment of ownership, dominion and control over it." *Bolles v. Toledo Trust Co.* (1936), 132 Ohio St. 21, 7 O.O. 60, 4 N.E.2d 917, paragraph one of the syllabus.

*Davis v. Davis*, 2001 WL 1667852, * 5 (7th Dist. Dec. 26, 2001).

**{¶25}** The law of gifts was not raised in the complaint. In their brief, Appellants cite to a gift reference made during Richard's cross-examination by Appellants' counsel:

> **[ATTORNEY BRUNNER]:** And you don't have any letter or any document in writing giving you a gift of these [corporate] items, do you?
>
> **[RICHARD]:** I do not.

(6/23/2025 Appellants' Brief, p. 4-5); (8/13/2024 Bench Trial Tr., p. 44).

**{¶26}** However, Richard testified on direct examination that he bought Colleen's interest in the Indianola property. (8/13/2024 Bench Trial Tr., p. 131-132, 134). Richard indicated:

Case No. 25 MA 0030

**[RICHARD]:** Well, after I was speaking with Christopher, Liz and Alex, and them saying they were going to lose it they told me that -- I told them about the liens on the property and I discussed with them. And they told me that to secure my $20,000 I was going to spend, that as long as I kept Chris for three years that the tools were mine.

Basically that they were handing everything over to me because he was retiring; he was done. And I was under the understanding that the real estate was supposed to be mine as soon as I purchased off of Colleen. Which I thought that's what happened. But it didn't.

(*Id.* at p. 133-134).

**{¶27}** Appellants also believe the trial court erred in finding that conversion and replevin did not apply.

Conversion . . . is "an exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another." *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990). The elements of conversion are: "(1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Francisco A. Mateo MD, Inc. v. Proia*, 7th Dist. Mahoning No. 22 MA 0053, 2023-Ohio-3908, ¶ 68. "The plaintiff need not be the owner but can have some other interest in the property; the first element includes a party with actual or constructive possession or an immediate right of possession at the time of conversion." *Id.*

Where conversion is premised on the unlawful retention of property, the plaintiff must demonstrate: (1) she demanded the return of the property from the possessor after the possessor exerted dominion or control over the property; and (2) that the possessor refused to deliver the property to its

rightful owner. *Keybank Natl. Assoc. v. Guarnieri & Secrest, P.L.L.*, 7th Dist. Columbiana No. 07 CO 46, 2008-Ohio-6362, ¶ 15.

*Givens v. Longwell*, 2024-Ohio-947, ¶ 10-11 (7th Dist.).

> In Ohio, replevin is solely a statutory remedy. *Gregory v. Martin*, 7th Dist. Jefferson No. 15 JE 17, 2016-Ohio-650, ¶ 20 "A replevin suit simply seeks to recover goods from one who wrongfully retains them at the time the suit is filed. Replevin does not even require an 'unlawful taking.' The plaintiff in replevin need only prove that he is entitled to certain property and that the property is in the defendant's possession." *Id.* (internal citations omitted.)

*Givens* at ¶ 8.

**{¶28}** In addition to the Junk Vehicles, Appellants claim Richard and/or Blood Bros. illegally took a 2016 Ford F450, 2019 Chevrolet Silverado 5500, 2014 Hino 268A (collectively "Commercial Vehicles"), 2015 Chevrolet SS, and an assortment of tools.

**{¶29}** When Appellants ceased operations, the Junk Vehicles were titled to them, specifically in the name of Got 2 Go Towing. The titles for the Junk Vehicles were transferred from Matthew, as the agent of Got 2 Go Towing, to Richard. However, the dispute between the parties is whether Appellants authorized, knew, and/or consented to the transfers.

**{¶30}** At the bench trial, Appellees presented evidence that the titles were transferred at Chris' request. Richard indicated that Chris called Matthew and asked him to sign the titles. Chris retrieved the titles from his toolbox and gave them to Richard. Alternatively, Chris denied giving the titles to Richard for Matthew to transfer. Chris claimed his toolbox was tampered with, i.e., "the locks were punched out." (8/13/2024 Bench Trial Tr., p. 76). On cross-examination, Chris was asked if he ever suspected or voiced concern over tools being stolen from the Indianola Property. Chris answered, "Well, I had cameras up and everything just to keep honest people honest." (*Id.* at p. 105). Chris was then asked if he had video footage of someone breaking into his toolbox and stealing the titles. Chris claimed "somebody broke into the shop and took [his] DVR

and removed them from the premises." (*Id.* at p. 106). Richard and Joseph picked up Stacy and went to Matthew's residence. Matthew, as the agent of Got 2 Go Towing, executed the Junk Vehicle titles and Stacy notarized them.

**{¶31}** We stress that the Ohio Secretary of State Certificate, contained in the record, reveals that Matthew is listed as the agent of Got 2 Go Towing. (effective date: 10/27/2016; expiration date: 10/27/2021). *See* (Exhibit 14). In Ohio, an act of an agent within the scope of his authority is binding. *Bd. of Ed. Toronto City Schools v. American Energy Utica, LLC*, 2020-Ohio-586, ¶ 26 (7th Dist.).

**{¶32}** In 2020, Matthew, as the agent of Got 2 Go Towing (seller), transferred the Junk Vehicle titles to Richard (buyer). As stated, the seven Junk Vehicles include: 2013 Hyundai Sonata; 2012 Volkswagen Jetta; 2010 Chevrolet Malibu; 1998 GMC Sonoma; 1995 Ford F150; 2005 Toyota Prius; and 2005 Mercedes Benz SL. Copies of all title transfers reference Got 2 Go Towing, "Agent" Matthew, and Richard. *See* (Exhibits 5-12). All title transfers were notarized by Stacy who was familiar with this family and its businesses. (*Id*).

**{¶33}** Thus, based on the facts presented, Appellants' position that Matthew lacked any authority to transfer titles is unfounded as the record clearly establishes all of the Junk Vehicle title transfers listed Got 2 Go Towing as the owner and Matthew was the agent of Got 2 Go Towing at the time the Junk Vehicle title transfers were made.

**{¶34}** In addition, Richard also testified as to what happened to each of the Junk Vehicles after the titles were transferred to Richard. The 2013 Hyundai Sonata, 2012 Volkswagen Jetta, 1995 Ford F-150, and 2005 Mercedes Benz SL were towed from the Indianola Property to Richard's residence. Richard denied ever locating or having possession of the 2005 Toyota Prius or 2010 Chevrolet Malibu. Richard said he had the 1998 GMC Sonoma crushed because it had a broken frame and was not salvageable.

**{¶35}** When Appellants ceased operations, the Commercial Vehicles were encumbered by liens and on the verge of being repossessed. At the bench trial, Richard testified as follows regarding the Commercial Vehicles:

> **[ATTORNEY ZOMOIDA]:** There was a 2019 Chevrolet Silverado tow truck. Do know what happened to that?

[RICHARD]: No.

[ATTORNEY ZOMOIDA]: Did you ever see it?

[RICHARD]: Yes.

[ATTORNEY ZOMOIDA]: When?

[RICHARD]: Christopher had Jimmy Rounds drive it out to my property at one time.

[ATTORNEY ZOMOIDA]: And when you say your property, you're talking about your property on Hopkins Road?

[RICHARD]: Yes.

[ATTORNEY ZOMOIDA]: Okay.

[RICHARD]: Because it was under repo. And then they came back out and took it back out of there.

[ATTORNEY ZOMOIDA]: Did you see it ever again after that?

[RICHARD]: No.

. . .

[ATTORNEY ZOMOIDA]: There was a 2014 Hino, H-i-n-o, what happened to that?

[RICHARD]: That's the one that was under repossession order. And I purchased it.

[ATTORNEY ZOMOIDA]: You paid off the loan?

[RICHARD]: Correct.

. . .

**[ATTORNEY ZOMOIDA]:** We'll get there. After the, after you paid off the loan did -- was the vehicle ultimately transferred to Blood Brothers Trucking?

**[RICHARD]:** You talking about the Hino?

**[ATTORNEY ZOMOIDA]:** Yes. I'm sorry. The Hino.

**[RICHARD]:** The Hino went into Matthew Bugno's name. Or Matthew Bugno had to sign is what Toyota told us.

**[ATTORNEY ZOMOIDA]:** Okay.

**[RICHARD]:** So Matthew Bugno had to sign because I guess Matthew was the person that was the --

**[ATTORNEY ZOMOIDA]:** I'm going to cut you off right here. Just -- I don't want to get into that. But did it ultimately ever get into the name of Blood Brothers Trucking?

**[RICHARD]:** Yes.

**[ATTORNEY ZOMOIDA]:** How did that happen?

**[RICHARD]:** That happened at the bank.

**[ATTORNEY ZOMOIDA]:** Okay. What bank are we talking about?

**[RICHARD]:** That would be Huntington at the time.

**[ATTORNEY ZOMOIDA]:** Was there a branch?

**[RICHARD]:** South Avenue.

**[ATTORNEY ZOMOIDA]:** So you were at the South Avenue branch and you were with --

**[RICHARD]:** Matthew Bugno. I picked him up and took him up there.

Case No. 25 MA 0030

[ATTORNEY ZOMOIDA]: And Matthew signed the titles transferring that Hino into the name of Blood Brothers Trucking?

[RICHARD]: Correct.

[ATTORNEY ZOMOIDA]: Did you ever have any reason to believe that Matthew Bugno . . . was not an authorized representative for either of the Plaintiffs in this case?

[RICHARD]: No. I actually believed he was.

[ATTORNEY ZOMOIDA]: Where is the Hino now?

[RICHARD]: I sold that Hino to Schultz Towing.

[ATTORNEY ZOMOIDA]: And how much did you receive for it?

[RICHARD]: I believe it was 38,000.

. . .

[ATTORNEY ZOMOIDA]: What happened to the 2016 Ford F-450?

[RICHARD]: I sold it.

[ATTORNEY ZOMOIDA]: Well, before we even get there. Was there a loan on that?

[RICHARD]: Yes, there was a $51,000 or $52,000 loan on that vehicle. And it got --

. . .

[ATTORNEY ZOMOIDA]: So you paid off that loan?

[RICHARD]: Yes.

. . .

**[ATTORNEY ZOMOIDA]:** And after you paid off that loan was that vehicle ultimately transferred into the name of Blood Brothers Trucking?

**[RICHARD]:** Yes.

**[ATTORNEY ZOMOIDA]:** Who caused the transfer to occur?

**[RICHARD]:** Matthew Bugno.

. . .

**[ATTORNEY ZOMOIDA]:** And did you invest any money into the F-450?

**[RICHARD]:** Yes, I had to replace the whole deck system on it. And I also had to replace the turbo unit on that.

**[ATTORNEY ZOMOIDA]:** How much did you spend to do that?

**[RICHARD]:** About 7,000.

**[ATTORNEY ZOMOIDA]:** Where is the F-450 now?

**[RICHARD]:** I sold it.

**[ATTORNEY ZOMOIDA]:** How much did you receive for it?

**[RICHARD]:** 51,000 or 50,000.

(8/13/2024 Bench Trial Tr., p. 145-151).

**{¶36}** Appellants additionally claim that a 2015 Chevrolet SS was illegally taken by Richard and/or Blood Bros. Unlike the Junk Vehicles, there is no evidence that the title for the Chevrolet SS was transferred from Appellants to Richard and/or Blood Bros. At the bench trial, Richard testified he never had possession of the Chevrolet SS:

[ATTORNEY ZOMOIDA]: There's also an allegation in the complaint that you and/or Blood Brothers Trucking took a 2015 Chevrolet SS. Did you and/or Blood Bros. Trucking ever possess this vehicle?

[RICHARD]: No.

[ATTORNEY ZOMOIDA]: Do you know what happened to the vehicle?

[RICHARD]: Christopher, it was under repossession order, had them put it in Jeremiah Bugno's --

[ATTORNEY ZOMOIDA]: Who is Jeremiah?

[RICHARD]: My brother -- in his garage. And from there, I don't know what happened.

[ATTORNEY ZOMOIDA]: But you never possessed it?

[RICHARD]: No.

[ATTORNEY ZOMOIDA]: Blood Brothers Trucking never possessed it?

[RICHARD]: No.

(8/13/2024 Bench Trial Tr., p. 144-145).

{¶37} Regarding the tools, Chris testified on direct examination that the tools were originally owned by him and sold to Appellants as part of his bankruptcy filing:

[ATTORNEY BRUNNER]: Okay. As a result of not working did you have to file bankruptcy in 2015?

[CHRIS]: Yes. Yes.

[ATTORNEY BRUNNER]: Okay. And you filed a personal bankruptcy, correct?

[CHRIS]: Yes.

[ATTORNEY BRUNNER]: Okay. And at that time you had certain tools that you used in your trade, correct?

[CHRIS]: Yes.

. . .

[ATTORNEY BRUNNER]: What happened to the rest of your tools through the bankruptcy?

[CHRIS]: Well, the [sic] Girard Technologies acquired them.

[ATTORNEY BRUNNER]: They purchased them out of the bankruptcy?

[CHRIS]: Yes.

(8/13/2024 Bench Trial Tr., p. 72-73).

{¶38} However, on cross-examination, it was clearly revealed that Appellants never purchased the tools from Chris' bankruptcy estate and that the tools are "technically" owned by Chris. (*Id.* at p. 96).

[ATTORNEY ZOMOIDA]: I would like for you to please take another look at what was marked as Plaintiffs' Exhibit 12, the tools.

[CHRIS]: Okay.

[ATTORNEY ZOMOIDA]: These are tools that you acquired over the years, correct?

[CHRIS]: Yes.

**[ATTORNEY ZOMOIDA]:** Okay. I'm having a hard time understanding though. Are these your tools or are these Girard Technologies' tools?

**[CHRIS]:** Girard Technologies.

**[ATTORNEY ZOMOIDA]:** Because they bought them through your bankruptcy?

**[CHRIS]:** Yes.

. . .

**[ATTORNEY ZOMOIDA]:** All right. Otherwise, there was no agreement -- other than what you claim through the bankruptcy, there was no agreement between you and Girard Technologies to sell your tools to them, correct?

**[CHRIS]:** It was in the shop area; it's gone.

**[ATTORNEY ZOMOIDA]:** But the question is, your testimony is that Girard Technologies purchased these tools, your tools out of your bankruptcy, correct?

**[CHRIS]:** Yes.

**[ATTORNEY ZOMOIDA]:** All right. It wasn't the first time you filed bankruptcy, was it?

**[CHRIS]:** No, I converted a --

**[ATTORNEY ZOMOIDA]:** Well, you actually filed in 2011, correct?

**[CHRIS]:** Yes.

**[ATTORNEY ZOMOIDA]:** Okay. You filed --

**[CHRIS]:** Thirteen or something.

**[ATTORNEY ZOMOIDA]:** You filed a Chapter 13 in 2011.

**[CHRIS]:** Okay.

**[ATTORNEY ZOMOIDA]:** All right. And then you filed a Chapter 7 bankruptcy in 2016, correct?

**[CHRIS]:** Yes.

**[ATTORNEY ZOMOIDA]:** And that's the bankruptcy that you're saying your tools were purchased, Girard Technologies purchased your tools out of?

**[CHRIS]:** I don't know.

**[ATTORNEY ZOMOIDA]:** Well, the first case was dismissed, correct?

**[CHRIS]:** Yes, converted.

**[ATTORNEY ZOMOIDA]:** Okay. Well, it was ultimately dismissed though, correct?

**[CHRIS]:** I don't know.

**[ATTORNEY ZOMOIDA]:** All right. Then what I'm going to do to maybe refresh your memory, I'm going to hand you what I'll mark as Defendant's Exhibit -- I'm actually going to mark it as Defendant's Exhibit C. Take a look at that document.

Now, take a look at the document for me please.

**[CHRIS]:** Yes.

**[ATTORNEY ZOMOIDA]:** Do you have any reason to dispute that this is a printout of the docket from your bankruptcy that was filed in 2011?

**[CHRIS]:** No.

**[ATTORNEY ZOMOIDA]:** And it says that, if you look over on the first page, right-hand corner, it says it was filed February 10th of '11, correct?

**[CHRIS]:** Okay.

. . .

**[ATTORNEY ZOMOIDA]:** Date filed, what does it say?

**[CHRIS]:** 2/10/2011.

**[ATTORNEY ZOMOIDA]:** All right. And it was terminated what day?

**[CHRIS]:** 5/20/2015.

**[ATTORNEY ZOMOIDA]:** And it says the debtor, that being you, was dismissed when?

**[CHRIS]:** That would be --

**[ATTORNEY ZOMOIDA]:** But if I represented to you that it says July 29th, 2014, would you have any reason to dispute?

**[CHRIS]:** Okay. No problem.

**[ATTORNEY ZOMOIDA]:** Okay. So this bankruptcy you filed but it was ultimately dismissed, correct?

**[CHRIS]:** Yes.

**[ATTORNEY ZOMOIDA]:** All right. So then I'm going to hand you what I've marked as Defendant's Exhibit A. You turn around and file a Chapter 7 bankruptcy, correct?

**[CHRIS]:** Yes.

**[ATTORNEY ZOMOIDA]:** And again, this is the bankruptcy where Alex -- sorry, Girard Technologies purchased your tools, correct?

**[CHRIS]:** Yes.

**[ATTORNEY ZOMOIDA]:** I'm going to ask you to please -- would have any reason to dispute Defendant's Exhibit A is a printout of the docket from your Chapter 7 bankruptcy that was filed in 2016?

**[CHRIS]:** No.

. . .

**[ATTORNEY ZOMOIDA]:** All right. There's an entry on the docket dated August 9th, 2016. And that is filed by the Chapter 7 trustee, which is a report of no distribution. Meaning that there were no assets that were liquidated by the Chapter 7 trustee.

There was no sale that took place in the Chapter 7 bankruptcy. The tools were never sold, purchased by Girard Technologies?

. . .

Okay. So you received a discharge and it was a no-asset case, correct?

**[CHRIS]:** That's what it says. Yes.

**[ATTORNEY ZOMOIDA]:** Okay. So if it's a no-asset case, and I know you're not a bankruptcy lawyer, that means there were no assets that

were liquidated through that bankruptcy. So they were never bought out by Girard Technologies in your bankruptcy. Any reason to dispute that?

**[CHRIS]:** No.

**[ATTORNEY ZOMOIDA]:** So you very well could own all of the tools still, correct?

**[CHRIS]:** Technically.

(8/13/2024 Bench Trial Tr., p. 91-96).

**{¶39}** In addition, regarding Appellants' argument that Richard and/or Blood Bros. illegally took their assets can be summarized by Richard's testimony:

**[RICHARD]:** Alex Bugno gave me the computers and the cars. And told me basically that everything -- basically, I mean, if you read all the messages from him that, and the conversations that are recorded from, on this entry, that he told me that the computers were mine to use as -- basically, he closed down his business. And he was no longer in business.

And we open up a new business. And Alex told me, you can use the computers. You can have them basically. Like there's no -- he was going for 17 years. He told us that we can have [the] computers and we can utilize them. And basically he was giving us the computers.

. . .

I was going to let it just go and buy my own tow trucks. Because I was looking [at] tow trucks. And then Mr. Bugno and his father said you should buy these tow trucks, these tow trucks; we're about to lose them.

They're hiding them everywhere so the repo companies can't get them. . . .

. . .

Case No. 25 MA 0030

[ATTORNEY ZOMOIDA]: Okay. Just to sum up: So it's your testimony that anything you did was done with full knowledge of Alex Bugno?

. . .

[RICHARD]: Yes.

[ATTORNEY ZOMOIDA]: As far as the towing --

[RICHARD]: Yes.

[ATTORNEY ZOMOIDA]: As far as --

[RICHARD]: Yes.

[ATTORNEY ZOMOIDA]: He was involved in communications?

[RICHARD]: Yes, I was talking to him on the penitentiary phone.

[ATTORNEY ZOMOIDA]: He actually sent you a letter too, didn't he?

[RICHARD]: Yes.

[ATTORNEY ZOMOIDA]: And in that letter he was explaining how to run a towing business?

[RICHARD]: Correct.

(8/13/2024 Bench Trial Tr., p. 24-25, 28, 161-162).

{¶40} Upon consideration, the record establishes that Appellants have not satisfied their burden of proof on any of the claims in their complaint. The trial court did not err in finding that conversion and replevin did not apply. There is no evidence that any of the title transfers were made without Appellants' knowledge and/or consent. Again, Chris had power of attorney for Appellants. Matthew was the agent of Got 2 Go Towing. Specifically regarding the Junk Vehicles, any claim that Matthew lacked any authority to

transfer titles is unfounded as the record clearly establishes Matthew was the agent of Got 2 Go Towing at the time the Junk Vehicle title transfers were made.

{¶41} Also, Appellants failed to sufficiently prove their ownership of the tools allegedly taken by Richard and/or Blood Bros. According to Chris' testimony on direct examination, Appellants acquired the tools through his bankruptcy. However, on cross-examination, it was clearly revealed that Appellant Girard Technologies, Inc. never purchased the tools from Chris' bankruptcy estate and that the tools are "technically" owned by Chris. (8/13/2024 Bench Trial Tr., p. 96). Furthermore, the docket from Chris' bankruptcy case reveals that ownership of the tools could not have been transferred through Chris' bankruptcy because no assets were liquidated by the trustee. In addition, the trial court did not err in finding that Appellants' computers had been returned to them and that any use of the computers and/or any other personal property belonging to Appellants by Richard and/or Blood Bros. was done with Appellants' knowledge and consent.

{¶42} Accordingly, the trial court did not err in concluding that Appellants did not provide sufficient evidence to prove their assets were illegally taken by Richard and/or Blood Bros. and entering judgment in favor of Appellees.

{¶43} Appellants' first and third assignments of error are without merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN FINDING THAT PLAINTIFF FAILED TO PLEAD THEIR CLAIM AS TO STACY FERRO WHEN SHE FAILED TO APPEAR AT TRIAL AND ADMITTED HER STATUTORY VIOLATIONS.**

{¶44} In their second assignment of error, Appellants contend the trial court erred in finding they failed to plead their claim as to Stacy, a notary public, when she failed to appear at trial and admitted her statutory violations. Appellants advance one issue: "Whether the trial court erred in not finding that Defendant Stacy Ferro neglected her statutory responsibilities, resulting in a legally deficient and unauthorized transfer of the vehicles to Defendant Richard Stiles." (6/23/2025 Appellants' Brief, p. 10).

**{¶45}** "In Ohio, a 'notary public may, throughout the state, administer oaths required or authorized by law,' R.C. 147.07, and '(n)o notary public shall certify to the affidavit of a person without administering the appropriate oath or affirmation to the person.' R.C. 147.14." *Toledo Bar Assn. v. Neller*, 2004-Ohio-2895, ¶ 11.

> A notary public is a public officer, 41 Ohio Jurisprudence 2d 3, Notaries and Commissioners, Section 3. A public officer is bound to perform the duties of his office faithfully, to use reasonable skill and diligence, and to act primarily for the benefit of the public. The public has the right to expect a public officer to exercise ordinary care and prudence in the trust committed to him. 44 Ohio Jurisprudence 2d 554, Public Officers, Section 67.

> It is well established in Ohio that where a person has done everything which the law requires him to do the law will not permit a diligent person to be deprived of a legal right because of a ministerial nonfeasance of a public officer. Cincinnati Traction Co. v. Ruthman, 85 Ohio St. 62, 96 N.E. 1019; Porter v. Rohrer, 95 Ohio St. 90, at 92, 115 N.E. 616.

*State ex rel. Smith v. Johnson*, 12 Ohio App.2d 87, 90-91 (7th Dist. 1967).

**{¶46}** In *Johnson*, the notary public did not administer an oath or affirmation to Mr. Boyer when he notarized Mr. Boyer's statement of candidacy. *Id.* at 89-90. Nevertheless, this court held: "We find that there is an inference from the evidence that Mr. Boyer intended to take upon himself the obligation of an oath when he went to a notary public, asked the notary public to notarize his 'Statement of Candidacy' and then signed the jurat in the presence of the notary public." *Id.* at 90. Thus, where Mr. Boyer went to a notary public and asked him to notarize his statement of candidacy, Mr. Boyer signed the jurat in front of the notary who notarized it, and the jurat was in a form prescribed by statute and contained the statements "being duly sworn" and "subscribed and sworn to before me" above the signature of the notary public, the document was properly "sworn to" as required by statute notwithstanding the fact that the notary did not administer an oath or affirmation to Mr. Boyer. *Id.*

**{¶47}** A notary public may be sued for negligence. *Keck v. Keck*, 54 Ohio App.2d 128 (5th Dist. 1977). "A negligence claim requires the plaintiff to prove: (1) duty; (2) breach of duty; (3) causation; and (4) damages." *Triad Hunter, LLC v. Eagle Natrium, LLC*, 2024-Ohio-5188, ¶ 22 (7th Dist.), citing *Anderson v. St. Francis-St. George Hosp., Inc.*, 77 Ohio St.3d 82, 84 (1996).

> "Whether the defendant owes a duty to the plaintiff presents a legal question that depends upon the foreseeability of the plaintiff's injuries." [*Lagowski v. Shelly & Sands, Inc.*, 2015-Ohio-2685 ¶ 7 (7th Dist.), citing *Anderson*, 77 Ohio St.3d at 84,] citing *Menifee v. Ohio Welding Products*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). "An injury is foreseeable if a reasonably prudent person would have anticipated that any injury was likely to result from the performance or nonperformance of an act." *Id.*

*Bacha v. Sam Pitzulo Homes & Remodeling, LLC*, 2019-Ohio-878, ¶ 15 (7th Dist.).

**{¶48}** Stacy admitted she did not administer an oath to Matthew and/or review any corporate documents during the Junk Vehicle title transfers. However, a reasonable person in Stacy's position would have no reason to suspect that Matthew did not have authority to sign on behalf of Appellants as he was the agent of Got 2 Go Towing. At the bench trial, Richard described Stacy as "my" notary. (8/13/2024 Bench Trial Tr., p. 29). Richard and Stacy are friends. Stacy knows Richard and Alex are brothers and Chris and Matthew are brothers and they are all related. As stated, Richard picked up Stacy and brought her to Matthew's house, a block away from Appellees' business. Matthew executed the titles in front of Stacy.

**{¶49}** In addition, Stacy attested to signatures on Exhibits five through 12. Because Matthew, as the agent of Got 2 Go Towing, signed the title transfers in front of Stacy who notarized them, and the title transfers were in a form prescribed by statute and contained language "subscribed and sworn to before me" above Stacy's signature, the documents were properly "sworn to" as required by statute notwithstanding the fact that Stacy did not administer an oath or affirmation to Matthew. *Johnson*, 12 Ohio App.2d at 90 (7th Dist. 1967).

**{¶50}** Even assuming arguendo that Stacy did breach a duty of care to Appellants, Appellants' claim still fails because they did not provide any credible evidence with regard to damages.

**{¶51}** This court has held that speculative damages are not recoverable. *Bobb Forest Products, Inc. v. Morbark Industries, Inc.*, 151 Ohio App.3d 63, ¶ 82 (Sept. 30, 2002, 7th Dist.); *E. Liverpool v. Buckeye Water Dist.*, 2010-Ohio-3170, ¶ 72 (7th Dist.); *Acme Co. v. Saunders TopSoil*, 2011-Ohio-6423, ¶ 57 (7th Dist.), quoting *Elias v. Gammel*, 2004-Ohio-3464, ¶ 25 (8th Dist.) ("'An award of damages must be shown with a reasonable degree of certainty and in some manner other than mere speculation, conjecture, or surmise.'")

**{¶52}** Seven titles were executed in this case. Of those seven titles, Richard denied locating or having possession of two of them. Richard testified that the five vehicles he did locate were essentially scrap. Nevertheless, Appellants assert each of the Junk Vehicles were worth thousands of dollars. However, the only evidence introduced regarding their values was from Alex and Chris who merely provided speculative amounts. *See Bobb* at ¶ 82; *E. Liverpool* at ¶ 72; *Acme* at ¶ 57; *see also Bova*, 2023-Ohio-1680, at ¶ 36 (7th Dist.) (the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts).

**{¶53}** Appellants' second assignment of error is without merit.

## CONCLUSION

**{¶54}** For the foregoing reasons, Appellants' assignments of error are not well-taken. The March 4, 2025 judgment of the Mahoning County Court of Common Pleas overruling Appellants' objection, adopting the magistrate's decision, and entering judgment in favor of Appellees is affirmed.

Waite, J., concurs.

Hanni, J., concurs.

Case No. 25 MA 0030

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**